No. 83,801

STATE OF KANSAS, *Appellee*, v. GAVIN D. SCOTT, *Appellant*.
(183 P.3d 801)

56

58

60

Opinion filed May 16, 2008.

*Rebecca E. Woodman,* capital appellate defender, and *Steven R. Zinn,* deputy appellate defender, argued the cause and were on the briefs for appellant.

*Stephen R. McAllister,* solicitor general, and *Autumn L. Fox,* assistant attorney general, argued the cause, and *Jared S. Maag,* deputy attorney general, *Phill Kline,* former attorney general, and *Paul J. Morrison,* attorney general, were with them on the briefs for appellee.

*Daniel E. Monnat,* of Monnat & Spurrier, Chtd., of Wichita, and *Paige A. Nichols,* of Lawrence, were on the brief for *amicus curiae* Kansas Association of Criminal Defense Lawyers.

The opinion of the court was delivered by

*Per Curiam:* Gavin Scott appeals from jury trial convictions for the capital murder of Elizabeth Brittain, premeditated first-degree murder of Douglas Brittain, aggravated burglary, criminal possession of a firearm, and felony theft. Scott has been sentenced to death for capital murder, with consecutive sentences of life imprisonment with a mandatory minimum term of 40 years for premeditated first-degree murder, 51 months for aggravated burglary, 9 months for criminal possession of a firearm, and 7 months for felony theft. We affirm Scott's convictions except for the crime of premeditated murder which is reversed, set aside the imposition of the death penalty, and remand for another sentencing proceeding to determine whether Scott should be sentenced to death.

Scott does not challenge the sufficiency of the evidence necessary to support his convictions. A narrative of the underlying facts and circumstances as reported in *State v. Wakefield,* 267 Kan. 116, 977 P.2d 941 (1999), was largely replicated in this proceeding. Additional facts will be provided where appropriate under the issues raised on appeal.

## THE LEGAL SUFFICIENCY OF COUNT SIX

Initially, Scott was charged in separate counts with the capital murders of Elizabeth Brittain and Douglas Brittain. K.S.A. 21-3439(a)(6) defines capital murder as the

"intentional and premeditated killing of more than one person as a part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct."

Before trial, Scott filed a motion to dismiss the charges as multiplicitous, alleging both deaths constitute a single crime of capital murder. At a motion hearing, the State did not concede the charges were multiplicitous but did amend the information to charge Scott with the premeditated first-degree murder of Douglas Brittain in count two and the capital murder of Elizabeth Brittain in count six.

Count six of the amended information states:

"[O]n or about September 13, 1996, A.D., in the County of Sedgwick, and the State of Kansas, one GAVIN D. SCOTT, did then and there unlawfully, intentionally and with premeditation kill Elizabeth G. Brittain, and that the intentional and premeditated killing of Elizabeth G. Brittain, and Douglas G. Brittain, was part of the same act or transaction or two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct."

Scott contends the district court erred in denying his motion to arrest judgment for the capital murder of Elizabeth Brittain because count six does not allege Scott killed Douglas Brittain, an essential element of the crime. We accept Scott's premise that an essential element of the capital murder charge is that the defendant killed Douglas Brittain.

The question of whether an information is sufficient to give the district court jurisdiction is a question of law over which this court has unlimited review. *State v. Shirley*, 277 Kan. 659, 661, 89 P.3d 649 (2004). In analyzing whether an information is sufficient, this court applies one of two tests, depending on when the objection is raised. *State v. Hooker*, 271 Kan. 52, 61, 21 P.3d 964 (2001); see *State v. Hall*, 246 Kan. 728, 764-65, 793 P.2d 737 (1990), *overruled in part on other grounds Ferguson v. State*, 276 Kan. 428, 78 P.3d 40 (2003). When a defendant files a motion for arrest of judgment

based on a defective information, the pre-*Hall* standard applies. *Hall*, 246 Kan. at 764. Under this standard, an information which omits one or more of the essential elements of the crime it attempts to charge is jurisdictionally and fatally defective, and a conviction based on such an information must be reversed. *State v. Sanford*, 250 Kan. 592, 600-01, 830 P.2d 14 (1992). However, even under the pre-*Hall* standard, an information is sufficient if it substantially follows the language of the statute or charges the offense in equivalent words or others of the same import so long as the defendant is fully informed of the particular offense charged and the court is able to determine under what statute the charge is founded. *State v. Micheaux*, 242 Kan. 192, 197, 747 P.2d 784 (1987).

K.S.A. 21-3439(a)(6) requires that the State's charging document allege: (1) The defendant killed more than one person; (2) the killings were intentional and premeditated; and, (3) the killings were part of the same act or transaction, or two or more connected transactions. Count six, the capital murder charge, alleges Douglas Brittain was killed intentionally and with premeditation; however, it does not explicitly allege Scott killed him. As already noted, count two does charge Scott with the intentional, premeditated murder of Douglas Brittain. However, because count two was not expressly incorporated by reference into count six, it does not provide a necessary element of the offense. See *State v. Garcia*, 243 Kan. 662, 667, 763 P.2d 585 (1988), *overruled in part on other grounds State v. Grissom*, 251 Kan. 851, 892-93, 840 P.2d 1142 (1992); *State v. Jackson*, 239 Kan. 463, 465-66, 721 P.2d 232 (1986).

The State contends count six should be held sufficient because it is drawn in the language of K.S.A. 21-3439(a)(6) and follows PIK Crim. 3d 56.00-A(1) and (3)(f). It is true an information drawn in the language of the substantive criminal statute is sufficient to withstand legal challenge. K.S.A. 22-3201(b); *State v. Micheaux*, 242 Kan. at 197. However, it is immaterial whether count six follows PIK Crim. 3d 56.00-A, as the legal sufficiency of a charging document is not dependent upon instructions of law. Parenthetically, Scott argues the trial court's instruction suffers from the same perceived deficiency as the information—the instruction does not explicitly require the State to prove Scott killed Douglas Brittain. The

sufficiency of the instruction to support Scott's conviction for the murder of Douglas Brittain is raised as a separate issue to be later addressed in this opinion.

Although we have stated a pre-*Hall* standard emphasizes "technical considerations, rather than practical considerations," *Hooker*, 271 Kan. at 61, we have also held "an information should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." *Micheaux*, 242 Kan. at 199. In *Micheaux*, we quoted from *State v. Morris*, 124 Kan. 505, 508, 260 Pac. 629 (1927), that "the day [has] passed in this jurisdiction 'when criminals can hope to go unwhipped of justice because of the want of a technical recital in a criminal information which neither misled nor prejudiced them in the preparation or management of their defense.' " 242 Kan. at 197.

Applying the above considerations to count six, we conclude the allegation Scott killed Douglas Brittain was necessarily implied by the language used and a commonsense reading of the charge. Consequently, this omission is distinguishable from omissions we have held constitute reversible error under the pre-*Hall* standard.

In *State v. Howell & Taylor*, 226 Kan. 511, 512-14, 601 P.2d 1141 (1979), a conviction for aggravated robbery was reversed because the complaint failed to allege the taking was by force or threat of great bodily harm. In *State v. Jackson*, 239 Kan. 463, 465-67, 721 P.2d 232 (1986), we reversed convictions for two counts of indecent liberties with a child, one because the complaint failed to allege the victim was under 16 years of age, and one because the complaint failed to allege the child was not married to the accused. In *State v. Browning*, 245 Kan. 26, Syl. ¶ 4, 774 P.2d 935 (1989), we reversed a conviction for second-degree murder because the complaint failed to allege malice. In *Hall*, 246 Kan. at 746-47, we reversed a conviction of theft because the complaint failed to allege the defendant intended to permanently deprive the owner of possession of his cattle. In *Sanford*, 250 Kan. at 599-602, we reversed a conviction for aggravated kidnapping because the amended information failed to allege an intent to inflict bodily injury, terrorize the victim, or facilitate flight or the commission of a crime.

In each of the above cases, reversal was predicated on the omission of an essential element that could not be clearly inferred from the language of the charging document. Such is not the case here; rather, this omission is a technical defect of the type we decried in *Morris*, 124 Kan. at 508. Although it would have been preferable for the State to have explicitly alleged in count six that Scott killed Douglas Brittain, we conclude the omission is not fatal under a pre-*Hall* standard and did not prejudice the defendant's ability to prepare a defense or impair his right to a fair trial.

## WHETHER COUNT TWO IS MULTIPLICITOUS WITH COUNT SIX

Scott next argues that if the capital murder charge does adequately charge "the intentional and premeditated killing of more than one person" (K.S.A. 21-3439[a][6]), his conviction for the premeditated first-degree murder of Douglas Brittain is multiplicitous.

We have stated "[m]ultiplicity is the charging of a single offense in more than one count of a complaint or information. It creates the potential for multiple punishments for a single offense, violating the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights." *State v. Harris*, 284 Kan. 560, Syl. ¶ 1, 162 P.3d 28 (2007). We have also held "[a] claim of multiplicity raises a question of law subject to unlimited appellate review." *Harris*, 284 Kan. 560, Syl. ¶ 3.

Although multiple punishments for the same crime are constitutionally prohibited, this prohibition extends only to prevent a sentencing court from prescribing greater punishments than the legislature intended. *State v. Garcia*, 272 Kan. 140, 143, 32 P.3d 188 (2001); see *Missouri v. Hunter*, 459 U.S. 359, 366-69, 74 L. Ed. 2d 535, 103 S. Ct. 673 (1983). The Double Jeopardy Clause is not violated where the legislature specifically authorizes cumulative punishment under two statutes for the same offense. *Garcia*, 272 Kan. at 143.

The issue is whether the Kansas Legislature intends cumulative punishment for capital murder under K.S.A. 21-3439(a)(6) and

first-degree premeditated murder under K.S.A. 21-3401(a). We conclude the answer is "no."

K.S.A. 21-3107(2) (Furse) states:

"Upon prosecution for a crime, the defendant may be convicted of either the crime charged or an included crime, but not both. An included crime may be any of the following:

"(a)  A lesser degree of the same crime;

"(b)  an attempt to commit the crime charged;

"(c)  an attempt to commit a lesser degree of the crime charged; or

"(d)  *a crime necessarily proved if the crime charged were proved.*" (Emphasis added.)

The parties agree that under K.S.A. 21-3107(2)(d) premeditated first-degree murder of Douglas Brittain is a crime necessarily proved once the capital murder of Elizabeth Brittain and Douglas Brittain is proved. However, that does not resolve the issue if there is a clear legislative intent to allow cumulative punishment. See *State v. Walker,* 283 Kan. 587, 611, 153 P.3d 1257 (2007); see also *State v. Schoonover,* 281 Kan. 453, 490-91, 133 P.3d 48 (2006) (recognizing it may not always be necessary to apply the same-elements test; there may be circumstances where the legislature's intent is otherwise clear). The State argues the Kansas Legislature has authorized cumulative punishment for these crimes.

In support of its argument, the State correctly notes K.S.A. 21-3439(a)(6) is patterned after a similar provision in the Virginia Death Penalty Act. See Minutes of the Senate Committee on Judiciary, February 24, 1994 (detailing the passage of an amendment to HB 2578 so as to pattern it after the Virginia statute); see also Minutes of the Senate Committee on Judiciary, March 1, 1994 (reconfirming the purpose of the amendment is to include provisions of Va. Code Ann. §18.2-31[7] [2003] defining capital murder in part as "[t]he willful, deliberate, and premeditated killing of more than one person as a part of the same act or transaction"). Moreover, before our legislature enacted K.S.A. 21-3439(a)(6), the Virginia Supreme Court had interpreted its death penalty statute as allowing simultaneous convictions of capital murder for multiple victims and conviction of first-degree murder for one or more of

those multiple victims. See *Woodfin v. Commonwealth,* 236 Va. 89, 372 S.E.2d 377 (1988), *cert. denied* 490 U.S. 1009 (1989).

In *Woodfin,* the defendant was convicted of premeditated first-degree murder and capital murder under § 18.2-31(g) of the Virginia Criminal Code for the killing of "more than one person as a part of the same act or transaction." On appeal, the defendant argued his conviction and punishment for first-degree murder violated double jeopardy. The Virginia Supreme Court disagreed, concluding the Virginia Legislature had clearly indicated its intent to impose multiple punishments. 236 Va. at 96-97. In reaching its conclusion, the court noted it had earlier reviewed the capital murder statutory scheme in *Fitzgerald v. Commonwealth,* 223 Va. 615, 292 S.E.2d 798 (1982), *cert. denied* 459 U.S. 1228 (1983), and determined the purpose of the statute was "gradation." *Woodfin,* 236 Va. at 96.

In urging us to apply similar reasoning to that of the Virginia Supreme Court, the State also asks this court to consider a prosecutor's charging dilemmas and potentially unjust results if a first-degree premeditated murder conviction is held to be multiplicitous with a capital murder conviction under K.S.A. 21-3439(a)(6). The State argues that depending on the election of a prosecutor, a defendant could be charged with multiple counts of first-degree premeditated murder or one count of capital murder. If charged and convicted of multiple counts of first-degree premeditated murder, hard 50 sentences could be imposed for each conviction. Conversely, if charged and convicted of one count of capital murder, only one hard 50 sentence could be imposed.

The above argument no longer appears to have merit for crimes committed after July 1, 2004, as the legislature amended K.S.A. 21-4624 and K.S.A. 21-4635 to provide that a defendant convicted of capital murder who does not receive a sentence of death shall be sentenced to life without the possibility of parole. We do not find a quantitative difference between a life sentence without the possibility of parole and multiple hard 50 sentences.

In interpreting §18.2-31(g) of the Virginia Criminal Code, the Virginia Supreme Court inferred a legislative intent to provide enhancement through gradation. See *Fitzgerald,* 223 Va. at 636-37.

This is an acceptable approach to discerning legislative intent in the absence of plain and unambiguous statutory language to the contrary. It does not appear, however, Virginia has a statute comparable to K.S.A. 21-3107(2)(d) (Furse), which precludes multiple convictions for both a crime charged and "a crime necessarily proved if the crime charged were proved." As discussed in *Schoonover*, 281 Kan. at 494, that statute is a clear expression of legislative intent that a defendant cannot be convicted of both a crime charged and a lesser included offense arising out of the same conduct.

The State has acknowledged the murder of Douglas Brittain was a crime necessarily proved under the charge of capital murder. Accordingly, under K.S.A. 21-3107(2)(d) (Furse), Scott's convictions were multiplicitous in the absence of clear and unambiguous legislative intent authorizing multiple prosecutions for the same conduct. We are unable to conclude from a plain reading of K.S.A. 21-3439(a)(6) and its legislative history that the legislature intended to override the acknowledged reach of K.S.A. 21-3107(2)(d). In other instances, the legislature has not hesitated to state when K.S.A. 21-3107(2) is not to be applied. See K.S.A. 21-3436 (precluding application of K.S.A. 21-3107[2] to specific felony offenses regardless of whether such felony is distinct from the alleged homicide). Here, there has been no such declared legislative intent. Accordingly, we conclude Scott's conviction for the first-degree premeditated murder of Douglas Brittain must be reversed.

## DENIAL OF SCOTT'S MOTION TO SUPPRESS STATEMENTS

A.    Scott's Request to Defer Interrogation

Scott next contends the district court erred in finding his statements made during interrogation were admissible. He contends any statements after his request to "finish this in the morning" should have been suppressed. He argues the detectives' continuing interrogation failed to honor his Fifth Amendment invocation of the right to remain silent.

During the interrogation, Scott initially denied any knowledge of the incident. Approximately midway through the interview, he

admitted to having been in the Brittains' house. Detectives began pressing him for more details of the crime, suggesting to him he owed it to the Brittains' children to tell them who the killer was and if his accomplice was the shooter. Detective Holtz then attempted to play on an earlier statement by Scott that he loved kids, stating:

"[T]ell us what happened. You gotta help yourself, man. You asked me if I'd help you out, you asked me if this thing was to help you and it is. We had enough to put you at a homicide scene, we need you to tell us what happened cause the other guy's gonna tell us his side. We've gotta have your side of what happened, man. And, and being fuzzy, if you were drunk, if, if it was fuzzy, that's, that's cool, but you're not a cold blooded enough dude that you can wipe out somebody killing somebody, cause you love people and you love those little kids and you love your own family. And if that happened, that's something you can't forget cause you're too, cause . . . ."

At that point, the following disjointed discussion took place, with the participants talking over one another:

"[Scott]: Can we finish this in the morning, man? Please?
"[Det. Oliver]: Why is that,
"[Det. Holtz]: Can't you tell us what's going on man? This, that other dude's,
"[Scott]: Man, I can't shoot,
"[Det. Holtz]: telling us what's happening, okay?
"[Scott]: let's finish this in the morning, man, I. Let's finish this in the morning.
"[Det. Holtz]: This other dude's telling us now, man.
"[Det. Oliver]: It's real simple,
"[Scott]: Man, I don't, I don't,
"[Det. Oliver]: uh, we're just asking you to pull back,
"[Scott]: remember.
"[Det. Oliver]: in your memory and
"[Scott]: I don't remember it.
"[Det. Holtz]: You remember being there though, you just told us that, man.
"[Scott]: Yes, I can, I can remember being there, I . . . ."

The detectives then continued the questioning, with Scott providing more details.

We have held a suspect's invocation of his or her right to remain silent must be scrupulously honored and cuts off further interrogation elicited by express questioning or its functional equivalent. *State v. Carty*, 231 Kan. 282, 286, 644 P.2d 407 (1982). However, where a suspect makes a statement which may be ambiguous as to

whether he or she is asserting a right to remain silent, the interrogator may, but is not required to, ask questions to clarify or may continue questioning without clarifying. *State v. Gonzalez*, 282 Kan. 73, 106, 145 P.3d 18 (2006). If the interrogator chooses to continue questioning without seeking clarification, he or she runs the risk of a later ruling the invocation was not ambiguous and any subsequent statements are thus inadmissible.

While Scott characterizes his requests to "finish this in the morning" as unambiguous assertions of his right to remain silent, we are unable to agree. At the *Jackson v. Denno* hearing on the admissibility of the confession, Detective Holtz testified he believed Scott made the requests because he was getting emotional and was embarrassed about doing so. See *Jackson v. Denno*, 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964). He stated Scott seemed to be in control of the situation and, after overcoming his embarrassment, proceeded to tell the detectives what had happened. This testimony, as well as the ambiguous nature of the requests, led the district court to rule as follows:

"[I]t's not a clear statement, I'm not gonna talk any more. It's just a request, Can't we stop. And that's ambiguous enough, that there's nothing wrong, there was no lengthy period of time used by the detective or detectives actually, in the plural, to force Mr. Scott into making a statement that was not freely and voluntarily made."

In asserting his statement was unambiguous, Scott cites *Michigan v. Mosley*, 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975). In *Mosley* the Supreme Court said:

"Through the [suspect's] exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting." 423 U.S. at 103-04.

Scott argues his request to delay the balance of interrogation was an attempt to control the time at which questioning occurs, and the continuing interrogation was contrary to the holding in *Mosley*. However, Scott's argument misreads *Mosley*, which stands for the proposition that a suspect can control the time at which questioning occurs *through the use of his or her power to exercise the right to*

*remain silent.* That is, the suspect can decide he or she does not want to answer questions at the time and invoke his or her right to remain silent, thus forcing police to question him or her at a different time. However, in doing so the suspect must still unequivocally invoke the right.

Scott cites two other cases for the proposition that a person subject to interrogation has a right to control the time at which questioning occurs: *Campaneria v. Reid,* 891 F.2d 1014 (2d Cir. 1989); and *Dodson v. State,* 513 A.2d 761 (Del. 1986). However, neither of these cases is supportive of Scott's argument. In *Campaneria,* the defendant explicitly told investigators he did not wish to talk and they should come back later. That is, the defendant used the right to remain silent to control the time at which questioning occurred exactly as contemplated by *Mosley*: He unambiguously invoked the right and additionally told officers to come back at another time. Similarly, in *Dodson,* the defendant told police he would make a statement in the future, but would not do so at the present time. 513 A.2d at 762-63. In both cases, the defendants unambiguously communicated to police they would not talk at the present time.

In contrast, Scott never stated he did not wish to talk; he simply indicated a desire to finish his statement the next morning. Because Scott's statement was not an unequivocal invocation of his right to remain silent, the detectives were not required to cease questioning. See *Davis v. United States,* 512 U.S. 452, 459, 129 L. Ed. 2d 362, 114 S. Ct. 2350 (1994); *State v. McCorkendale,* 267 Kan. 263, 273, 979 P.2d 1239 (1999); see also *Martin v. Wainwright,* 770 F.2d 918, 923 (11th Cir. 1985) (holding the defendant's statement "[c]an't we wait till tomorrow" was an "equivocal" invocation of the right to remain silent), *modified on other grounds* 781 F.2d 185 (11th Cir. 1986).

B.   Denial of Timely First Appearance

Scott next contends inculpatory statements made during interrogation should be suppressed as the statements resulted from the State's failure to comply with K.S.A. 22-2901. He further contends this failure resulted in deprivation of constitutional protections un-

der the Fourth and Sixth Amendments to the United States Constitution. A time line is helpful to understand Scott's contention:

1. Saturday, September 14, 1996. Scott is arrested without a warrant for felony possession of a firearm.
2. Sunday, September 15, 1996. A district judge enters an ex parte probable cause finding and sets bond.
3. Monday, September 16, 1996. Scott is not brought before a magistrate for first appearance on the firearms charge. Scott is interviewed that evening regarding the Brittain murders.
4. Tuesday, September 17, 1996. A district judge enters ex parte probable cause findings regarding the murders and related charges; bond is set.
5. Wednesday, September 18, 1996. The State makes an ex parte request to postpone the first appearance of Scott because the investigation is ongoing and more time is needed to determine whether capital murder charges will be filed and, if so, against whom. The State also informs the district judge the capital defender's office has expressed a desire to be appointed to defend the more culpable of the two suspects. The district court agrees to postpone Scott's first appearance until Thursday, September 18, 1996.
6. Thursday, September 19, 1996. Scott has his first appearance.

## K.S.A. 22-2901(1) provides:

"[W]hen an arrest is made in the county where the crime charged is alleged to have been committed, the person arrested shall be taken without unnecessary delay before a magistrate of the court from which the warrant was issued. *If the arrest has been made on probable cause, without a warrant, he shall be taken without unnecessary delay before the nearest available magistrate and a complaint shall be filed forthwith.*" (Emphasis added.)

## In *State v. Crouch & Reeder*, 230 Kan. 783, 785-86, 641 P.2d 394 (1982), the general purpose of the statute was held to be as follows:

"K.S.A. 22-2901 is patterned after similar provisions found in Rule 5 of the Federal Rules of Criminal Procedure (18 U.S.C.A. Rule 5) and in statutes adopted in other states. There are many cases which hold that the purpose of requiring a person under arrest to be taken to a magistrate without unnecessary delay is to safeguard individual rights without hampering effective and intelligent law enforcement. . . . It has also been stated that the purpose of the rule is to abolish unlawful detention that provides an opportunity for improper pressure by the police before the arrestee has been informed of his rights. [Citation omitted.] It is designed to reduce the opportunity for third-degree practices by the police and to protect the rights of the accused by making certain that he is advised of his constitutional rights by a judicial officer. [Citations omitted.]"

We also stated in *Crouch & Reeder* that whether an unnecessary delay occurred in bringing an accused before a judge of the district court depends on the facts and circumstances of each case. 230 Kan. at 786. We have also held an unreasonable delay in an accused's first appearance is not in and of itself a denial of due process unless it in some way prejudices the accused's right to a fair trial. *State v. Goodseal*, 220 Kan. 487, 500, 553 P.2d 279 (1976), *overruled on other grounds State v. Underwood*, 228 Kan. 294, 615 P.2d 153 (1980).

The question of unnecessary delay at a first appearance under 22-2901 was recently addressed in the companion case of *State v. Wakefield*, 267 Kan. 116, 123-24, 977 P.2d 941 (1999). In *Wakefield*, an assistant district attorney went before the judge the day after the defendant's arrest and requested a finding that the postponement of both Wakefield's and Scott's first appearance for an additional day was a necessary delay, as an appropriate investigation had not been completed. He explained there were multiple crime scenes to process, witnesses to interview, and evidence to inventory before a decision could be made as to whether the defendant should be charged with capital murder. Further, he explained the capital defender's office had expressed a desire to represent the more culpable of the two codefendants, and therefore, in order to avoid conflicts of interest, it was important to ascertain which of the codefendants was more culpable before charging the crime and appointing counsel. 267 Kan. at 124-25. In *Wakefield*, we held: "Clearly, Wakefield was not taken for first appearance without delay. However, when considering the circumstances of this case, and the potential conflicts in appointing the capital defender, that delay was necessary." 267 Kan. at 125. We also held any delay was not prejudicial, as there was no evidence the defendant was subjected to coercive questioning during the additional time prior to his first appearance. 267 Kan. at 125-26.

We conclude *Wakefield* is controlling and excuses the delay in arraignment for charges arising from the September 13th nighttime invasion of the Brittain residence. However, our decision in *Wakefield* does not pertain to the delay in Scott's arraignment for the charge of criminal possession of a firearm. The State has not

provided any reasons justifying the failure to arraign on Monday, September 16, 1996, and we conclude there was a failure to comply with the unambiguous requirements of K.S.A. 22-2901.

The question, then, is what the remedy for this violation should be. We have held an unwarranted delay in and of itself is not a denial of due process unless it in some way prejudices the accused's right to a fair trial. *Goodseal*, 220 Kan. at 500. The burden to show prejudice is on the defendant. *State v. Taylor*, 217 Kan. 706, 708, 538 P.2d 1375 (1975).

Scott argues his rights were prejudiced by the delay. He notes that, had he been arraigned on Monday, the district court would have advised him of his constitutional and trial rights and appointed counsel to represent him. Although he concedes his right to counsel would have been specific to the gun charge, he contends that had counsel been appointed for him, he would have undoubtedly been advised to invoke his Fifth Amendment rights in any subsequent interrogation and thus would not have given his confession on Monday night.

We have stated that " 'a confession obtained during a period of illegal detention is not inadmissible if voluntarily made and not the product of the detention.' " *Goodseal*, 220 Kan. at 501 (quoting *State v. Law*, 214 Kan. 643, 650, 522 P.2d 320 [1974]); see *State v. Stubbs*, 195 Kan. 396, 401, 407 P.2d 215 (1965). Conversely, even a voluntary confession that is the product of the detention may be inadmissible. Thus, for instance, the fact a defendant initially declined to speak, but later relented in the face of repeated questioning, might give rise to an inference the delay was the cause of the confession and thus require suppression. However, mere speculation the defendant might not have confessed if he or she had been appointed counsel, and he or she would have been appointed counsel except for the delay, is not sufficient to demonstrate that delay caused the confession. Our case law on this issue preserves the main purpose of a prompt first appearance required under 22-2901, which is to prevent detentions that provide an opportunity for improper pressure from police interrogators before the arrestee has been informed of his or her rights and to reduce

the opportunity for third-degree practices. *Wakefield*, 267 Kan. at 124; *Crouch & Reeder*, 230 Kan. at 785-86.

We conclude the record on appeal lacks evidence that the length of the delay was a causal factor in Scott's confession or his confession was somehow coerced. Although it may be speculated Scott might not have confessed had he been appointed counsel, the failure to appoint him counsel did not cause the confession. As a result, Scott has failed to show his right to a fair trial was prejudiced by any unnecessary delay.

## JURY INSTRUCTIONS

### A. The Capital-Murder Instruction

This issue is related to the first issue raised by Scott. Here, he contends the district court erred in failing to instruct on an essential element of capital murder—that he killed Douglas Brittain.

When considering challenges to jury instructions, we are required to consider the instructions as a whole and not isolate any one instruction. Even if erroneous in some way, instructions are not reversible error if they properly and fairly state the law as applied to the facts of the case and could not have reasonably misled the jury. *State v. Edgar*, 281 Kan. 47, 54, 127 P.3d 1016 (2006).

The district court's instruction followed PIK Crim. 3d 56.00-A(1) and (3)(f). However, we conclude the pattern instruction is deficient as it does not require a claim that Scott killed Douglas Brittain. This does not end our analysis. Although the jury was not explicitly instructed that in order to convict Scott of capital murder it had to find he killed Douglas Brittain, the jury was properly instructed with regard to the elements of the premeditated first-degree murder of Douglas Brittain and found Scott guilty of that offense. We conclude the instructions, read as a whole, fairly and properly stated the law and a jury could not have reasonably been misled.

### B. Definition of "Premeditation"

Scott next contends the district court's instruction defining "premeditation" was clearly erroneous. The jury was instructed: " 'Premeditation' means to have thought over the matter beforehand.

There is no particular time period for premeditation." Scott argues the district court erred in overruling his objection to this instruction.

Scott argues this definition of premeditation, and especially the second sentence informing the jury there is no particular time period for premeditation, is erroneous. According to Scott, by informing the jury the only requirement for premeditation is to have thought over the matter beforehand, and then adding that no particular time period is required, the instruction conflates premeditated first-degree murder with intentional second-degree murder.

The first sentence of the instruction is taken directly from PIK Crim. 3d 56.04(b) (1994 Supp.), which we have consistently approved. See *State v. Martis*, 277 Kan. 267, 298-302, 83 P.3d 1216 (2004); *State v. Hebert*, 277 Kan. 61, 87-88, 82 P.3d 470 (2004); *State v. Pabst (Pabst II)*, 273 Kan. 658, 660, 44 P.3d 1230, *cert. denied* 537 U.S. 959 (2002); *State v. Wimbley*, 271 Kan. 843, 849-50, 26 P.3d 657 (2001); *State v. Donesay*, 270 Kan. 720, 725, 19 P.3d 779 (2001); *State v. Jamison*, 269 Kan. 564, 573, 7 P.3d 1204 (2000); *State v. Saleem*, 267 Kan. 100, 105, 977 P.2d 921 (1999). As Justice Davis, speaking for the court, stated in *Hebert*:

"This court has approved PIK Crim. 3d 56.04(b) (1994 Supp.) multiple times, most recently in *Jamison*, *Pabst II*, and *Wimbley*. While we approve of the changes in the definition of premeditation [in PIK Crim. 3d 56.04(b)(2001 Supp.)] and urge trial courts to use the new PIK instruction on premeditation, we do not depart from our most recent decision approving the PIK Crim. 3d 56.04(b) (1994 Supp.) definition of premeditation. Thus, we conclude that the trial court in this case did not err in rejecting the defendant's proposed additional instruction." 277 Kan. at 89.

We also note a premeditation instruction containing language very similar to that contained in the second sentence of the instruction has been held not to constitute error in *State v. Patterson*, 243 Kan. 262, 268, 755 P.2d 551 (1988), and *State v. Kingsley*, 252 Kan. 761, 771, 851 P.2d 370 (1993). However, neither of these cases was a capital case. Notwithstanding, even if we apply a standard of heightened scrutiny to this issue, the district court's instruction does not constitute reversible error.

Our conclusion is based on the circumstances of this case as shown by the evidence. There was overwhelming evidence of premeditation beyond any semblance of instantaneous acts. The evidence showed: Scott and Jason Wakefield took at least one gun with them while breaking into the Brittain's home; they talked about shooting Douglas and Elizabeth Brittain while they were asleep; Scott broke into a gun cabinet just outside the Brittain's bedroom to get a different gun that was used to shoot the couple; Scott tried to get Wakefield to shoot the couple and took the gun from Wakefield when he refused to shoot them; and Scott then shot both victims as they slept.

We conclude the district court's instruction defining premeditation was not erroneous. We further conclude under the circumstances shown by the evidence, any error was harmless.

## PROSECUTORIAL MISCONDUCT

Generally, Scott raises five different issues of prosecutorial misconduct. Before considering each of his concerns, we note our prior holdings and the framework for analyzing claims of prosecutorial misconduct during closing argument.

A prosecutor has the duty to refrain from making improper, leading, inflammatory, or irrelevant statements to the jury. This duty is heightened in capital cases. *State v. Kleypas*, 272 Kan. 894, 953, 40 P.3d 139 (2001), *overruled in part on other grounds State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004). We employ a two-step analysis in considering claims of prosecutorial misconduct: First, the court must determine whether the prosecutor's statements were outside the wide latitude for language and manner a prosecutor is allowed when discussing the evidence; second, it must determine whether the comments constitute plain error, that is, whether the statements were so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial. *State v. Tosh*, 278 Kan. 83, Syl. ¶ 1, 91 P.3d 1204 (2004).

In *Tosh*, we explained an appropriate analysis under the second step in prosecutorial misconduct cases:

"The first step of the analysis having been met, we turn to the second step—whether the conduct was so gross and flagrant as to prejudice the jury against Tosh and thus deny him a fair trial, thereby requiring reversal.

"The Court of Appeals quoted the following passage from *State v. Jones*, 273 Kan. 756, 782, 47 P.3d 783, *cert. denied* 537 U.S. 980 (2002):

'The appellate court considers three factors to determine whether a new trial should be granted because of prosecutorial misconduct: (1) whether the misconduct is so gross and flagrant as to deny the accused a fair trial; (2) whether the remarks show ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. [Citation omitted.]'

"Obviously, the first of these three factors merely repeats in part the statement of the ultimate second step of the analysis: 'Whether the misconduct was so gross and flagrant that it denied the defendant a fair trial.' Thus, the second step of the analysis is essentially directed to whether the misconduct is so prejudicial that it denies the defendant a fair trial. This analysis requires a particularized harmlessness inquiry utilizing the three factors set out in *Jones*.

"With this clarification of the two-step analysis, then the question of whether the prosecutor's behavior was gross and flagrant can occupy a sensible and appropriate place in our analysis as the first of three factors to be considered in the harmlessness inquiry. None of these three factors is individually controlling. Further, it is important that the character of the three factors ensures that our harmlessness inquiry in the unique setting of prosecutorial misconduct will be both practical and punitive, as it should be. Prosecutorial misconduct not only injects error into a criminal trial. It violates the prosecutor's ethical obligations. But we recognize that there are degrees of seriousness in such misbehavior, and our appellate courts must have the freedom to consider those degrees and their likely effects as they decide whether the misbehavior before them in a given case merits reversal and remand for new trial." 278 Kan. at 93-94.

Regarding the third factor—whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of jurors—we said in *Tosh*:

"This factor sounds most like the harmlessness examination now required by K.S.A. 60-26. . . . It also echoes the federal harmless error rule declared in *Chapman v. California*, 386 U.S. 18, 22, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) . . . .

. . . .

"In recent years this court and our Court of Appeals have reviewed case after case in which prosecutorial misconduct occurred and the State has argued that such misconduct was harmless error because there was overwhelming evidence against the defendant. The records and oral arguments in those cases have sometimes reflected an attitude on the part of prosecutors that a defendant can be denied a fair trial where the evidence is substantial. Taken to its logical conclusion, acceptance or endorsement of this attitude would lead to a rule that the greater

the evidence against a defendant, the less right that defendant has to a fair trial. Neither law nor basic justice can tolerate such a rule. Denial of a fair trial violates the due process rights of the guilty defendant just as surely as those of the innocent one.

"These observations counsel caution in our evaluation of the third of the three harmlessness factors in prosecutorial misconduct cases. We must avoid using this factor and the weight of the inculpatory evidence as a default, a shortcut past careful comparison of the often competing influences of the first two factors. We also regard the prosecutorial misconduct case as an appropriate one for application of the dual standard discussed in [*State v.*] *Donesay*, 265 Kan. [60,] 88[, 959 P.2d 862 (1998)]. Before the third factor can ever override the first two factors, an appellate court must be able to say that both the K.S.A. 60-261 and the *Chapman* harmlessness tests have been met. If this can be said, then certainly it will also be true 'that the misconduct would likely have little weight in the minds of jurors.'" 278 Kan. at 96-98.

We now turn to Scott's complaints.

## A. Exhorting Jurors to Honor Their Oath

Scott complains of the following remark by the prosecutor toward the conclusion of his initial closing argument: "This man sits before you guilty. That's what we're asking you to do, to honor your oath as you have done and return that verdict."

By telling jurors to honor their oath and return a verdict of guilty, the prosecutor implied that to do otherwise would be a violation of duty. Such comments have been found to be improper by a variety of courts. See *State v. Reynolds*, 264 Conn. 1, 182-84, 836 A.2d 224 (2003); *Redish v. State*, 525 So. 2d 928, 930-31 (Fla. Dist. App. 1988); *People v. Nelson*, 193 Ill. 2d 216, 226-28, 737 N.E.2d 632 (2000); *People v. Kidd*, 175 Ill. 2d 1, 50-51, 675 N.E.2d 910 (1996); *State v. Coleman*, 74 Wash. App. 835, 838-40, 876 P.2d 458 (1994); *Dysthe v. State*, 63 P.3d 875, 885 (Wyo. 2003). The Connecticut Supreme Court stated in *Reynolds*: "[I]t generally is improper for the state to argue that the jurors' oath obligates them to return a particular verdict because such language poses a risk of diverting the jury from its duty of deciding the case on the basis of the evidence and the applicable law." 264 Conn. at 183. In *People v. Nelson*, the Illinois Supreme Court characterized this type of argument as "wholly inappropriate." 193 Ill. 2d at 227.

A comment telling the jurors they should honor their oath and they would do so by finding the defendant guilty is also similar to statements urging the jury to "do its job" that the United States Supreme Court disapproved in *United States v. Young*, 470 U.S. 1, 84 L. Ed. 2d 1, 105 S. Ct. 1038 (1985). In *Young*, the Court noted such an appeal, whether by the prosecutor or defense counsel, "has no place in the administration of justice." 470 U.S. at 9; see also *United States v. Mandelbaum*, 803 F.2d 42, 43-44 (1st Cir. 1986) (decrying a prosecutor's comment to the jury to do its duty and stating: "There should be no suggestion that a jury has a duty to decide one way or the other; such an appeal is designed to stir passion and can only distract a jury from its actual duty: impartiality.").

B. Referring to Scott as a "Murderer" and "Killer"

The remarks complained of occurred after the prosecutor had argued the evidence pointed toward Scott as the actual triggerman rather than Wakefield. The prosecutor then stated:

"And, if you haven't done it already, take a good look into the eyes of a killer. Look long and look hard, because he sits about eight feet from you. There sits before you a murderer of two people."

A short time later, the prosecutor, while talking about one of the Brittains' daughter's discovery of Scott coming in through her bedroom window, stated: "Look at the killer before you, because [the daughter's] last and final eternal memory of her parents in her house is what you saw." The prosecutor also referred to Scott as a killer at other times during closing. Two of those remarks, "[Wakefield's] not the real killer. This is the killer," and that the evidence shows "that's the killer before you," appear to have been attempts to differentiate Scott's conduct from Wakefield's. However, two other comments, referring to Scott as a "killer who murders helpless, innocent people in their sleep, who spend their lifetime with their children collecting these possessions so they can have a family," and asking the jury to "return into this courtroom and tell this killer that's what he is," were not proper.

This court's jurisprudence regarding prosecutors referring to a defendant as a "killer" or "murderer" makes a distinction regarding

the manner in which the statement is used. In *State v. Cravatt*, 267 Kan. 314, 333-34, 979 P.2d 679 (1999), we noted: "[W]e have in the past allowed the prosecution to refer to the defendant as a 'murderer' so long as nothing in the statement predicts consequences of acquittal or intensifies any kind of 'fear in the neighborhood' sentiment." In *Cravatt*, we found the prosecutor's comment to the jury that it should not "let a murderer go free because of these half-baked theories the defense has presented to you" was not improper. 267 Kan. at 332; see also *State v. Collier*, 259 Kan. 346, 355, 913 P.2d 597 (1996) (holding a prosecutor's statement that if the jury was mad at his actions, it should be mad at him but should not "let a murderer go free because of it" was not improper).

However, we have found comments characterizing the defendant as a "murderer" or "killer" to be improper in other contexts. In *State v. McCray*, 267 Kan. 339, 347, 979 P.2d 134 (1999), we held the prosecutor's remark directing the jury to "[l]ook at [the defendant], ladies and gentlemen, you have to look at him. That's what a murderer looks like, ladies and gentlemen," was improper because it injected the prosecutor's personal opinion of the defendant's guilt. Similarly, in *State v. Hooker*, 271 Kan. 52, 67, 21 P.3d 964 (2001), we held the prosecutor's remark that the defendant had "cold-blooded killing eyes" was improper for the same reason. Also, in *State v. Scott*, 271 Kan. 103, 114, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001), we stated the prosecutor's remark to the jury, "Yeah, you have about eight feet separating you from the hands of a killer right here," was inflammatory and therefore improper.

The consistent rule to be taken from the cases is that a prosecutor may refer to the defendant as a murderer or killer in the course of arguing the evidence shows the defendant committed the murder. See *Cravatt*, 267 Kan. at 332-34. However, where such statements imply the prosecutor believes something other than the evidence shows the defendant to be a murderer, such as the prosecutor's belief the defendant "looks like a murderer" or has "cold-blooded killing eyes," or the statements do not relate to the evidence but are simply made to inflame the jury, such as a

comment telling the jurors they are "eight feet from a killer," the argument will be held improper. See *Scott*, 271 Kan. at 114; *Hooker*, 271 Kan. at 67; *McCray*, 267 Kan. at 347-48.

We conclude some of the prosecutor's comments were proper and others were improper. The remarks arguing Scott, rather than Wakefield, was the killer were not improper, but were instead fair comment based on the evidence. However, other remarks were clearly improper. The prosecutor's statement asking the jury to "take a good look into the eyes of a killer" was improper. See *Scott*, 271 Kan. at 114. Although it did not imply, as in *Scott*, that the defendant's eyes were "killing eyes," neither did it bear any real relation to a comment on the evidence. Likewise improper were the prosecutor's comments directing the jury to "[l]ook at the killer before you," and referring to Scott as a "killer who murders helpless, innocent people in their sleep, who spend their lifetime with their children collecting these possessions so they can have a family," and asking jury to "return into this courtroom and tell this killer that's what he is."

## C. Stating that Scott Kept Lying

Scott next complains of the prosecutor's statement that, during Scott's interrogation, after the detectives had told him he had no reason to lie if he was not the triggerman, "he continues to deceive, he keeps on lying." Scott contends that, through this statement, the prosecutor injected his personal opinion Scott was a liar.

We have previously held a prosecutor's comment on the credibility of a witness is improper. See *State v. Pabst*, 268 Kan. 501, 506, 996 P.2d 321 (2000). This is because "the ultimate conclusion as to any witness' veracity rests solely with the jury." 268 Kan. at 507.

However, a look at the prosecutor's statement in context demonstrates he was not commenting on the general credibility of the defendant. During this portion of the closing argument, the prosecutor stated:

"And, finally, Holtz's point, Gavin, at the very end of the interview, towards the end, before he slips up and mentions Trey, if you're not the triggerman, you have no reason to lie to me. But he continues to deceive, he keeps on lying, and then

he slips up at the very end. He says, yeah, Trey took the steering wheel when I lit a cigarette."

We conclude the prosecutor was referring to the fact the defendant continued to lie to police by telling them he did not know the identity of his accomplice, before finally admitting "Trey" was his accomplice. Thus, the statement was not a comment on the defendant's credibility, but was instead a fair comment on the evidence.

### D. Vouching for Credibility of Witness

Scott contends the prosecutor made statements that constituted vouching for the credibility of Johnny McClung. In referring to the testimony of McClung, the jailhouse informant who testified Scott had confessed committing the crimes to him, the prosecutor stated:

"Once Gavin's in jail, where you can't come and go, he doesn't have the guts to tell Johnny McClung, I murdered a mom and dad in their bed in their sleep and I left them for their children for breakfast. He doesn't have the guts to say that. But you know that he told that to Johnny Dale McClung. You know that. Did Johnny just make it up? Did Johnny just make it up and we happened to have Gavin in the house with fingerprints? You know that he told Johnny that.

"And, if he told Johnny that, you think Johnny just gratuitously added, oh, by the way, he said he murdered them as they came down the stairs? Johnny McClung, for all the problems he has, is telling you what this man told him. How could it be otherwise?"

It is improper for a prosecutor to "vouch" for the credibility of a witness. See *State v. Davis*, 275 Kan. 107, 122, 61 P.3d 701 (2003). However, it is not improper for a prosecutor to argue that of two conflicting versions of an event, one version is more likely to be credible based on the evidence. See *State v. Anthony*, 282 Kan. 201, 210, 145 P.3d 1 (2006); *Davis*, 275 Kan. at 122. The prosecutor's statement in this case does not constitute vouching. Instead, his argument regarding McClung's credibility was based upon the evidence; that is, the content of McClung's trial testimony.

### E.   Reference to Facts Outside the Evidence

The final argument made by Scott regarding prosecutorial misconduct concerns the prosecutor's statement about a part of his confession. During closing, the prosecutor stated:

"Gavin tells Detective Holtz, I don't do burglaries. It's a three hour interview. If you listen to it for 60 hours over the past two years, you'd know it by heart. But let me remind you what Gavin says. I don't do burglaries, even though Travis—that's the guy that he was arrested with on Saturday, the 14th—even though Travis tried to get me to do a burglary. And you remember what Gavin tells Holtz. He says, yeah, Travis tried to get me to do a burglary, he told me where the house was, he told me what's inside the house, and he told me where all the stuff was inside the house, but I don't do burglaries anymore. Certainly begs the question, doesn't it, ladies and gentlemen."

Although not entirely clear, it appears the prosecutor's point was, although Scott said he did not do burglaries, all indications from the evidence were that Scott committed the burglary in question.

Scott argues the prosecutor's statement to the effect that he had listened to the confession tape for 60 hours and knew it by heart was improper because (1) there was no evidence in the record as to how long the prosecutor actually listened to the tape, and (2) the statement was designed to make the jury believe the prosecutor's recollection of the tape was especially accurate.

The statement complained of is a comment on a matter outside the evidence and is improper. See *Pabst*, 268 Kan. at 507 (holding it is improper for a prosecutor to refer to facts outside the evidence). However, Scott does not argue the prosecutor's subsequent characterization of his statement was somehow false or misleading. It is not reasonable to conclude the comment was anything more than a harmless retrospection.

### F.   Conclusion

We have noted numerous instances of improper comment by the prosecutor in closing argument. While these improper comments do not appear to be gross and flagrant misconduct, reasonable minds may disagree as to whether the sheer number of such remarks demonstrate ill will on the part of the prosecutor. How-

ever, ill will is only one of the factors we must consider in determining whether Scott was denied a fair trial.

The evidence of Scott's guilt of each crime for which he was convicted was direct and overwhelming. Scott confessed to the robbery, and his fingerprints were on the upstairs gun case from which the murder weapon was taken. Further, evidence Scott was the actual triggerman came not only from a jail house informant, but from statements by Scott to two of his friends or acquaintances. The only defense witness during the guilt phase of the trial was Dr. Robert Geffner, a professor of psychology, who testified Scott suffers from a brain impairment and posttraumatic stress disorder. Dr. Geffner opined that Scott does not have a good verbal memory and is prone to exaggerate. It is apparent the jury chose to believe the State's witnesses and did not believe Scott fabricated his own culpability for these horrific crimes.

Under the circumstances of this case, refusal to grant a new trial based on the few prejudicial remarks of the prosecutor is not inconsistent with substantial justice. See K.S.A. 60-261. Further, even applying a standard of heightened scrutiny to this issue, we conclude beyond a reasonable doubt the evidence of guilt was of such a direct and overwhelming nature that the prejudicial remarks of the prosecutor were likely to have had little weight in the minds of the jurors.

## CLOSING ARGUMENT

Scott contends the district court erred in allowing the prosecutor to read to the jury statements made by Wakefield's defense attorney during closing argument in the Wakefield trial. We agree the district court erred but conclude the error was harmless.

At the center of this controversy is the alleged jailhouse confession by Scott to a cellmate, Johnny McClung. Before trial, the district court granted Scott's motion to use in closing argument certain statements made by the prosecutor in the Wakefield prosecution casting aspersions on the reliability of McClung's testimony. The district court also allowed the State to read additional statements made by the prosecutor relating to McClung's reliability. It appears the district court reasoned the prosecutor's statements from the

Wakefield trial qualified as admissions of a party opponent under K.S.A. 60-460(g). These rulings are not in issue but offered in explanation as to the circumstances precipitating the ruling and issue presented on appeal.

Over objection of Scott's attorney, the district court also allowed the prosecutor to read to the jury the following statements made by Wakefield's attorney, Richard Ney, during closing argument in the Wakefield trial:

"[Ney]: Gavin Scott tells Johnny McClung, 'Hey, I did it. I killed them. I shot 'em. Yet this guy was with him, this guy Trey. He didn't do—he didn't do anything. In fact, he sat down, broke down and cried like a baby. And I put a gun on him and made him get out of there. Made him leave.' "

Courts interpreting the same hearsay exception as K.S.A. 60-460(g) under Federal Rule of Evidence 801(d)(2) have held the prior inconsistent statement of a *prosecutor* in one trial is generally admissible in a retrial of the same person. See *United States v. DeLoach*, 34 F.3d 1001, 1005-06 (11th Cir. 1994); *United States v. Orena*, 32 F.3d 704, 716 (2d Cir. 1994); *United States v. Salerno*, 937 F.2d 797, 811 (2d Cir. 1991), *rev'd on other grounds* 505 U.S. 317, 120 L. Ed. 2d 255, 112 S. Ct. 2503 (1992). However, these authorities are not supportive of the district court's ruling admitting the statement of another defendant's attorney during a prior trial.

We conclude the district court erred in allowing the State to read to the Scott jury the above statements made by Wakefield's attorney in the former trial. Wakefield's attorney is not "a representative" of Scott under 60-460(g). In fact, Richard Ney was attempting to demonstrate Scott was the actual perpetrator of the murders, not Wakefield. Clearly, Wakefield's penal interests were directly contrary to those of Scott. There is no legal basis for admission of this obvious hearsay.

Nevertheless, there has been an inadequate showing of prejudice to Scott resulting from the use of the Ney statements. Ney's representation of McClung's statements was consistent with McClung's testimony during Scott's trial. We conclude the use of the statements constitutes harmless error beyond a reasonable doubt. The error had no likelihood of having changed the result of

the trial. See *State v. Thompkins,* 271 Kan. 324, 335, 21 P.3d 997 (2001).

## CUMULATIVE ERROR

Scott contends cumulative errors denied him his right to a fair trial. We do recognize cumulative trial errors may be so great as to require reversal of a defendant's conviction where, under the totality of the circumstances, they prejudice the defendant and deny him or her a fair trial. *Kleypas,* 272 Kan. 894, 1001, 40 P.3d 139 (2001). However, no prejudicial error may be found under the rule of cumulative error if the evidence is overwhelming against the defendant. *State v. Ackward,* 281 Kan. 2, 29, 128 P.3d 382 (2006).

We have already identified instances of trial error. We balance the cumulative impact of that error against the evidence presented demonstrating Scott's guilt. We conclude the evidence presented to the jury was overwhelming that Scott committed the crimes for which he has been convicted. Consequently, even considered together, the trial errors did not prejudice Scott's right to a fair trial or influence the verdicts of the jury.

## GUILT PHASE CONCLUSION

Scott's convictions of capital murder, aggravated burglary, felony theft, and criminal possession of a firearm are affirmed. We reverse Scott's conviction of first-degree premeditated murder because it is multiplicitous with his conviction of capital murder and, therefore, in violation of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. We turn next to the sentencing issues raised on appeal.

## CONSTITUTIONALITY OF THE
## WEIGHING EQUATION

Scott contends the weighing equation set forth in K.S.A. 21-4624(e) violates the cruel or unusual punishment prohibition of § 9 and the due process provision of § 18 of the Kansas Constitution

Bill of Rights. K.S.A. 21-4624(e) (Furse) provides, in pertinent part:

"If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced to death; otherwise, the defendant shall be sentenced as provided by law."

### Section 9 of the Kansas Constitution Bill of Rights states:

"All persons shall be bailable by sufficient sureties except for capital offenses, where proof is evident or the presumption great. Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted."

Section 18 of the Kansas Constitution Bill of Rights states: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

Scott contends the weighing equation violates §§ 9 and 18 of the Kansas Constitution Bill of Rights because it mandates a sentence of death when aggravating and mitigating circumstances are found to be in equal balance, i.e., equipoise, thus preventing the jury in "doubtful cases" from expressing its "reasoned moral response" to the mitigating evidence.

A brief history of the issue of the constitutionality of the weighing equation of K.S.A. 21-4624(e) will provide the necessary framework for the parties' arguments and our analysis of this issue.

In *State v. Kleypas*, 272 Kan. 894, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), a divided majority of this court held the weighing equation of K.S.A. 21-4624(e) was unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution because it mandates death when the aggravating and mitigating circumstances are in equipoise. However, rather than strike the statute as unconstitutional on its face, the court applied the avoidance doctrine to construe the statute in a constitutional manner. So construed, K.S.A. 21-4624(e) required a sentence of death only where the aggravating circumstances outweigh the mitigating circumstances.

While Scott's appeal was pending, the issue of the constitutionality of the weighing equation once again came before the court in *State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004). This court held the weighing equation was facially unconstitutional under the Eighth Amendment, and overruled that part of *Kleypas* in which the court applied the avoidance doctrine to construe K.S.A. 21-4624(e) to apply constitutionally. *State v. Marsh*, 278 Kan. at 535. The United States Supreme Court granted the State's petition for writ of certiorari and reversed, holding the weighing equation of K.S.A. 21-4624(e) does not violate the Eighth Amendment prohibition against cruel and unusual punishment. *Kansas v. Marsh*, 548 U.S. 163, 165 L. Ed. 2d 429, 126 S. Ct. 2516 (2006); see Kansas Supreme Court's supplemental opinion to *State v. Marsh*, 282 Kan. 38, 144 P.3d 48 (2006).

An in-depth discussion of the decisions in *Kleypas* and *State v. Marsh* will not be presented here. The main point for consideration is that both of those decisions construed and applied the Supreme Court's death penalty jurisprudence in determining whether the weighing equation in K.S.A. 21-4624(e) violated the Eighth Amendment's prohibition against cruel and unusual punishment. The decisions in *Kleypas* and *State v. Marsh* were by bare majorities, with vigorous dissents on the majority's construction and application of Supreme Court precedent.

Most specifically, the key point of disagreement was whether the issue of the constitutionality of the weighing equation had already been resolved in *Walton v. Arizona*, 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990), *overruled on other grounds Ring v. Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002). In *Walton*, the United States Supreme Court upheld the constitutionality of Arizona's weighing formula, which required a sentence of death where one or more aggravating circumstances are found to exist and "there are no mitigating circumstances sufficiently substantial to call for leniency." *Walton*, 497 U.S. at 644.

The majority in *Kleypas* distinguished *Walton*, noting the language in the Arizona statute was not the same as that used in K.S.A. 21-4624(e). *Kleypas*, 272 Kan. at 1006-07. Thus, the *Kleypas* majority concluded, the issue of equipoise was not raised or decided

in *Walton*. *Kleypas*, 272 Kan. at 1007. The majority in *Kleypas* and *State v. Marsh* agreed *Walton* did not control resolution of the issue. See *State v. Marsh*, 278 Kan. at 536-37; *Kleypas*, 272 Kan. at 1006-07, 1008-09. The dissenters in both cases, on the other hand, argued *Walton* was dispositive of the issue and compelled the conclusion that the weighing equation did not violate the Eighth Amendment. *Kleypas*, 272 Kan. at 1125-27, 1130 (Davis, J., dissenting); *Kleypas*, 272 Kan. at 1140-41 (Abbott, J., dissenting); *State v. Marsh*, 278 Kan. at 557-59 (Davis, J., dissenting); *State v. Marsh*, 278 Kan. at 564-72 (Nuss, J., dissenting).

In a five to four decision, the United States Supreme Court reversed *State v. Marsh*, holding *Walton* controlled: "Contrary to Marsh's contentions and the Kansas Supreme Court's conclusions, . . . the question presented in the instant case was squarely before this Court in *Walton*." *Kansas v. Marsh*, 548 U.S. at 171. Applying *Walton*, the Court held: "Kansas' death penalty statute, consistent with the Constitution, may direct imposition of the death penalty when the State has proved beyond a reasonable doubt that mitigators do not outweigh aggravators, including where the aggravating circumstances and mitigating circumstances are in equipoise." 548 U.S. at 173.

After concluding *Walton* controlled, the Court went on to hold that, even if it did not, "the general principles set forth in our death penalty jurisprudence would lead us to conclude that the Kansas capital sentencing system is constitutionally permissible." 548 U.S. at 173. The Kansas capital sentencing system meets the individualized sentencing requirements imposed by *Furman v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972), and its progeny because it "permits a jury to consider any mitigating evidence relevant to its sentencing determination" and "does not interfere, in a constitutionally significant way, with a jury's ability to give independent weight to evidence offered in mitigation." 548 U.S. at 175. The weighing equation "merely channels a jury's discretion by providing it with criteria by which it may determine whether a sentence of life or death is appropriate." 548 U.S. at 177. Kansas' system "provides the type of ' "guided discretion," '

*Walton*, 497 U.S. at 659 (citing *Gregg* [*v. Georgia*, 428 U.S. 153, 189, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976)]), we have sanctioned in *Walton*, *Boyde* (*v. California*, 494 U.S. 370, 108 L. Ed. 2d 316, 110 S. Ct. 1190 [1990]), and *Blystone* [*v. Pennsylvania*, 494 U.S. 299, 108 L. Ed. 2d 255, 110 S. Ct. 1078 (1990)]." 548 U.S. at 177. Moreover, the mandatory language of the statute "does not prevent a Kansas jury from considering mitigating evidence"; thus, it is not "impermissibly mandatory." 548 U.S. at 177-78.

Scott's appeal had been held in abeyance pending the outcome of *Kansas v. Marsh*. After that decision, Scott's motion requesting permission to file a supplemental brief to address, among other issues, the constitutionality of K.S.A. 21-4624(e) under the Kansas Constitution was granted, and supplemental briefs were filed.

The United States Supreme Court's decision in *Kansas v. Marsh* is the final word on the question of whether K.S.A. 21-4624(e) violates the Eighth and Fourteenth Amendments to the United States Constitution. See *Trinkle v. Hand*, 184 Kan. 577, 579, 337 P.2d 665, *cert. denied* 361 U.S. 846 (1959) (under Article VI of the United States Constitution, "the interpretation placed on the Constitution and laws of the United States by the decisions of the Supreme Court of the United States is controlling upon state courts and must be followed. This we may add is true regardless of views of state courts even though such decisions are inconsistent with their prior decisions."). However, this court, as the ultimate expositor of state law (see *Mullaney v. Wilbur*, 421 U.S. 684, 691, 44 L. Ed. 2d 508, 95 S. Ct. 1881 [1975]), has the authority to interpret our state constitutional provisions independent of federal interpretation of corresponding provisions. *State v. Schultz*, 252 Kan. 819, 824, 850 P.2d 818 (1993). Scott urges us to interpret §§ 9 and 18 of our Kansas Constitution Bill of Rights to provide a "greater degree of rationality and reliability . . . in the determination of whether death is an appropriate punishment" than the Supreme Court has required under the Eighth Amendment as construed in *Kansas v. Marsh*.

In addressing the constitutionality of a statute, our standard of review is clear. Whether K.S.A. 21-4624(e) is constitutional raises a question of law over which we exercise an unlimited standard of review. See *State v. Myers*, 260 Kan. 669, Syl. ¶ 3, 923 P.2d 1024 (1996), *cert. denied* 511 U.S. 1118 (1997). When the constitutionality of a statute is questioned, we are guided by the following well-established rules:

"The constitutionality of a statute is presumed. All doubts must be resolved in favor of its validity, and before the act may be stricken down it must clearly appear that the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it. If there is any reasonable way to construe the statute as constitutionally valid, that should be done. A statute should not be stricken down unless the infringement of the superior law is clear beyond substantial doubt." *State v. Myers*, 260 Kan. 669, Syl. ¶ 4.

In determining the constitutionality of 21-4624(e), we must first determine the meaning of "cruel or unusual" punishment as that phrase appears in § 9. Do we interpret § 9 to have a broader or different meaning than that given to the Eighth Amendment to the United States Constitution? If the answer is "yes," what is our interpretation, and does it render 21-4624(e) unconstitutional?

Scott contends core principles of death penalty jurisprudence, embraced by our majority opinions in *Kleypas* and *Marsh*, cannot be disregarded under §§ 9 and 18 of the Kansas Constitution Bill of Rights. He argues that in *Kansas v. Marsh*, the United States Supreme Court ignored its own precedent on the principles underlying the doctrine of individualized sentencing, which require that the sentencing jury be permitted to give effect to any relevant mitigating evidence so it can express its reasoned moral response to the mitigating evidence—a fundamental requirement for reliability in the determination that death is the appropriate sentence. In short, Scott argues the Supreme Court was wrong. Accordingly, Scott urges this court to find that §§ 9 and 18 of the Kansas Constitution Bill of Rights demand "a greater degree of rationality and reliability than the Eighth Amendment in the determination of whether death is an appropriate punishment for an individual offender." He asks this court to reaffirm, under § 9 and § 18 of the

Kansas Constitution Bill of Rights, its holding in *Kleypas*, 272 Kan. at 1016, that fundamental fairness requires a "tie goes to the defendant" when life or death is at issue.

Scott's first argument for an independent construction of § 9 focuses on the textual difference between the Eighth Amendment, which prohibits "cruel *and* unusual punishment" and § 9, which prohibits "cruel *or* unusual punishment."

The State counters by arguing that while this court has noted its right to construe state constitutional provisions independent of federal interpretations of the federal Constitution, it has not traditionally done so. *Murphy v. Nelson*, 260 Kan. 589, 597, 921 P.2d 1225 (1996); *State v. Morris*, 255 Kan, 964, 981, 880 P.2d 1244 (1994). Moreover, with respect to § 9 specifically, the State argues this court has consistently declined to interpret that provision more broadly than the Eighth Amendment. The State cites *State v. Scott*, 265 Kan. 1, 5, 961 P.2d 667 (1998); *State v. Spain*, 269 Kan. 54, 59, 4 P.3d 621 (2000); and *State v. Kleypas*, 272 Kan. at 1051.

In *Scott*, involving a challenge to the public disclosure provisions of the Kansas Offender Registration Act as cruel or unusual punishment under § 9 of the Kansas Constitution Bill of Rights, the court stated:

"Although we have the right to interpret our Kansas Constitution in a manner different than the United States Constitution has been construed, *State v. Schultz*, 252 Kan. 819, 824, 850 P.2d 818 (1993), we have not traditionally done so. See *Murphy v. Nelson*, 260 Kan. 589, 597, 921 P.2d 1225 (1996). The wording of both clauses is nearly identical, and we will look to constructions of both provisions in reaching our conclusions herein." 265 Kan. at 5.

In *State v. Spain*, in a challenge to the hard 40 sentencing scheme, the court construed § 9 in harmony with the Eighth Amendment, noting, "this court has never extended greater protection to our citizens beyond the federal guarantees." 269 Kan. at 59 (citing *Schultz*, 252 Kan. at 826). It does not appear, however, it was specifically argued in *Spain* that the language of § 9 justified a different interpretation.

In *Kleypas*, the defendant argued the death penalty was per se unconstitutional under § 9 of the Kansas Constitution Bill of Rights. The argument rested primarily on the difference in lan-

guage between the two provisions. The court, however, noted it "has generally not drawn a distinction between the analysis of whether a sentence is cruel *or* unusual under the state constitution and whether a sentence is cruel *and* unusual under the federal Constitution." 272 Kan. at 1047.

The court also rejected Kleypas' argument that the historical record behind the adoption of § 9 indicated the framers deliberately chose the phrase "cruel or unusual" over "cruel and unusual," justifying a more broad interpretation. 272 Kan. at 1047-48. Significantly, the issue before the *Kleypas* court did not concern the proportionality of the sentence imposed.

Scott invites us to reexamine the historical record and the case law of other jurisdictions in support of his argument. We have done so and find no support for his challenge to the constitutionality of the weighing equation in K.S.A. 21-4624(e). His argument does not go to the proportionality of the sentence imposed, but to the process in determining against whom the death penalty should be imposed. Regardless of whether the set of punishments encompassed by the term "cruel or unusual" is larger than the set which could be described as both "cruel and unusual," the process itself used to arrive at the decision is not implicated. Scott's argument must fail.

Our decision today should not be construed to preclude future interpretation of § 9 when considering the proportionality of a criminal sentence. In such a circumstance, we are free to further consider the historical record and decide whether § 9 should be interpreted in a manner which deviates from that given to the Eighth Amendment by the United States Supreme Court.

Scott's next argument is that because the United States Supreme Court's decision in *Marsh* was a retreat from the constitutional principles this court relied upon in *Kleypas* in finding K.S.A. 21-4624(e) unconstitutional, this court has a duty to independently consider the constitutionality of that statute under our own state constitution. In support, Scott cites *State v. McDaniel & Owens*, 228 Kan. 172, 185, 612 P.2d 1231 (1980), in which this court found § 9 of the Kansas Constitution Bill of Rights allowed a proportionality analysis after the Supreme Court in *Rummell v. Estelle*, 445

U.S. 263, 63 L. Ed. 2d 382, 100 S. Ct. 1133 (1980), retreated from the proportionality analysis under the Eighth Amendment.

The court in *McDaniel* expressed its dissatisfaction with the *Rummell* decision and noted specifically it had relied upon the now obsolete federal precedents in formulating its proportionality test set forth in *State v. Freeman*, 223 Kan. 362, 574 P.2d 950 (1978). 228 Kan. at 184. Finding that *Rummell* was "a retreat from the philosophy which spawned the [test] recited in *Freeman*," and that the *Rummell* Court has "reject[ed] the proposition that disproportionality analysis is required by the 8th Amendment," the Court stated:

"The *Rummell* decision forces this court to reconsider its reliance on the 8th Amendment prohibition against cruel or unusual punishment. According to *Rummell* we are not *required* by the 8th Amendment to question the length of prison sentences." 228 Kan. at 184.

The *McDaniel* court then looked to the state constitution and held "section 9 of the Kansas Bill of Rights may be invoked against an excessive or disproportionate sentence." 228 Kan. at 185. The court reaffirmed the *Freeman* analysis, stating that "[t]he techniques applied in *Freeman* will continue to guide our constitutional inquiry." 228 Kan. at 185.

Scott also cites *State v. Kennedy*, 666 P.2d 1316, 1323 (Or. 1983). In *Kennedy*, the Oregon Supreme Court refused to adopt the United States Supreme Court's decision in *Oregon v. Kennedy*, 456 U.S. 667, 72 L. Ed. 2d 416, 102 S. Ct. 2083 (1982), in which the Court held double jeopardy bars a retrial only where judicial or prosecutorial misconduct was intended to provoke the defendant's request for a mistrial. He also cites *State v. Dubose*, 699 N.W.2d 582, 591-94 (Wis. 2005), a case in which the Wisconsin Supreme Court refused to follow the United States Supreme Court's decision in *Neil v. Biggers*, 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972) (allowing admission of unduly suggestive out-of-court identifications if reliable under the totality of the circumstances).

Scott is correct that state courts have relied upon their own state constitutions to depart from United States Supreme Court deci-

sions deviating or retreating from a broader rule of constitutional law. See *State v. Miller*, 29 Conn. App. 207, 222-23, 614 A.2d 1229 (1992) (Connecticut courts have construed provisions in their state constitution to provide greater protection than the federal Constitution, especially "where the United States Supreme Court 'has created exceptions to or deviated from rules previously enunciated' "); *People v. Scott*, 79 N.Y.2d 474, 497, 593 N.E.2d 1328 (1992) ("An independent construction of our own State Constitution is particularly appropriate where a sharp or sudden change in direction by the United States Supreme Court dramatically narrows fundamental constitutional rights that our citizens have long assumed to be part of their birthright."); *State v. Marsala*, 216 Conn. 150, 579 A.2d 58 (1990) (Connecticut Supreme Court refused to follow *United States v. Leon*, 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405 [1984], which created the good faith exception to the exclusionary rule—a clear departure from prior law); *People v. Bullock*, 485 N.W.2d at 870-74, 885 (Michigan Supreme Court relied on its own constitution to reject the Supreme Court's decision in *Harmelin v. Michigan*, 501 U.S. at 965, in which the Court characterized its prior decisions concerning whether the Eighth Amendment contains a proportionality guarantee as "simply wrong.").

Scott's argument on this point is based on the premise that the Supreme Court in *Kansas v. Marsh* retreated from the core principles of individualized sentencing developed by *Furman* and its progeny. We do not agree with Scott's premise. In *Kansas v. Marsh*, no prior precedents were called into question or rejected, no exception to a prior rule was created, nor were any new legal principles announced. In fact, the decision rested primarily on *Walton v. Arizona*, 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990), as controlling. Additionally, the Court analyzed the statute under the Court's mitigation jurisprudence, discussing and applying *Boyde v. California*, 494 U.S. 370, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990); *Blystone v. Pennsylvania*, 494 U.S. 299, 108 L. Ed. 2d 255, 110 S. Ct. 1078 (1990); *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982); *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978); *Franklin v.*

*Lynaugh*, 487 U.S. 164, 101 L. Ed. 2d 155, 108 S. Ct. 2320 (1988); *Gregg v. Georgia*, 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976); and *Furman v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2736 (1972). In its holding, the Court specifically stated the "Kansas capital sentencing system is constitutionally permissible" within *"the general principles set forth in our death penalty jurisprudence."* (Emphasis added.) 548 U.S. at 173. Thus, we conclude the decision in *Kansas v. Marsh* is nothing more than the application of well-settled law to the particular statute at issue.

Although Scott decries the decision as a retreat from the core principles underlying the requirement of individualized sentencing, Scott's argument that the *Kansas v. Marsh* majority was wrong is based on the same cases the majority relied upon in *Kansas v. Marsh*. Moreover, those same cases underlie Justice Souter's dissent in that case. See *Kansas v. Marsh*, 548 U.S. at 204-11 (Souter, J., dissenting) (citing and discussing *Furman, Gregg, Blystone*, and *Boyde*, among others). Furthermore, Scott also relies heavily on the majority decision in *Kleypas*, which was based on the same line of cases. See *Kleypas*, 272 Kan. at 1010-16.

The disagreement in *Kleypas, State v. Marsh*, and *Kansas v. Marsh* is not a disagreement over what the applicable capital sentencing jurisprudence under the Eighth Amendment is or should be. All of the justices of the two courts agree on the core principles. Rather, the disagreement is over whether K.S.A. 21-4624(e), requiring the imposition of the death penalty when the aggravating and mitigating circumstances are in equipoise, satisfies or violates those core principles.

Because *Kansas v. Marsh* was not a decision in which the United States Supreme Court created a new legal principle deviating or retreating from its prior capital sentencing jurisprudence, decisions in which state courts turned to their own constitution to depart from Supreme Court decisions altering, abrogating, or overruling prior constitutional principles do not provide persuasive support for doing so in this case.

We conclude Scott's arguments are not persuasive that K.S.A. 21-4624(e) should be held unconstitutional under §§ 9 and 18 of the Kansas Constitution Bill of Rights.

Anticipating our decision, Scott also argues the Supreme Court's interpretation of K.S.A. 21-4624(e) will require additional jury instructions in capital sentencing proceedings beyond those presently given. Scott argues sentencing juries will need to be informed equipoise is not the determining factor and told they have the power to dispense mercy after weighing aggravating and mitigating circumstances.

Scott also argues that under *Kansas v. Marsh*, the jury must be given an instruction of a presumption of life imprisonment as the appropriate sentence and a death sentence can only be imposed if the presumption is overcome by the State. For support Scott cites the instruction on the presumption of innocence in PIK Crim. 3d 52.02.

We do not find Scott's arguments to support additional instructions persuasive. *Kansas v. Marsh* cannot be read to require an additional step beyond weighing. In fact, the United States Supreme Court specifically reasoned a decision that the aggravating and mitigating factors are in equipoise is a decision supporting imposition of the death penalty:

"[Marsh's] argument rests on an implausible characterization of the Kansas statute—that a jury's determination that aggravators and mitigators are in equipoise is not a *decision*, much less a decision *for death*—and thus misses the mark. [Citations omitted.] Weighing is not an end; it is merely a means to reaching a decision. The decision the jury must reach is whether life or death is the appropriate punishment. The Kansas jury instructions clearly inform the jury that a determination that the evidence is in equipoise is a decision for—not a presumption in favor of—death. Kansas jurors, presumed to follow their instructions, are made aware that: a determination that mitigators outweigh aggravators is a decision that a life sentence is appropriate; a determination that aggravators outweigh mitigators *or* a determination that mitigators do not outweigh aggravators—including a finding that aggravators and mitigators are in balance—is a decision that death is the appropriate sentence; and an inability to reach a unanimous decision will result in a sentence of life imprisonment. So informed, far from the abdication of duty or the inability to select an appropriate sentence depicted by Marsh and Justice Souter, a jury's conclusion that aggravating evidence and mitigating evidence are in equipoise is a *decision for death* and is indicative of the type of

measured, normative process in which a jury is constitutionally tasked to engage when deciding the appropriate sentence for a capital defendant." 548 U.S. at 179-80.

Scott has also misconstrued the Supreme Court's discussion as to whether K.S.A. 21-4624(e) creates a presumption for life or death. In its majority opinion, the Court noted the State bears the burden at every turn in attempting to secure a sentence of death, and the defendant is not required to bear any burden beyond presenting mitigating circumstances. See *Kansas v. Marsh*, 548 U.S. at 178-79. Read in context, the Court's comment does not require a jury instruction of a presumption that life imprisonment is the appropriate sentence and that a sentence of death can only be imposed if the presumption is overcome by the State.

## CONSTITUTIONALITY OF RELAXED EVIDENTIARY STANDARD

Scott argues the relaxed evidentiary standard for the penalty phase set forth in K.S.A. 21-4624(c) is unconstitutional because it is incompatible with fundamental due process.

K.S.A. 21-4624(c) provides, in pertinent part:

"In the sentencing proceeding, evidence may be presented concerning any matter that the court deems relevant to the question of sentence and shall include matters relating to any of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto and any mitigating circumstances. Any such evidence which the court deems to have probative value may be received regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. Only such evidence of aggravating circumstances as the state has made known to the defendant prior to the sentencing proceeding shall be admissible, and no evidence secured in violation of the constitution of the United States or of the state of Kansas shall be admissible."

Scott contends that, because the Court in *Ring v. Arizona*, 536 U.S. 584, 605, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002), found the aggravating circumstances in the Arizona death penalty statute are the "functional equivalent of an element of a greater offense," due process requires they be proved only by the rules of evidence.

In *United States v. Fell*, 360 F.3d 135 (2d Cir. 2004), the court held the Federal Death Penalty Act's relaxed evidentiary standard was constitutional, stating the relaxed evidentiary standard does not " 'impair the reliability or relevance of information at capital sentencing hearings,' " but rather " 'helps to accomplish the individualized sentencing required by the constitution.' " 360 F.3d at 145-46 (quoting *United States v. Jones*, 132 F.3d 232, 242 [5th Cir. 1998]). Further, it appears that every other court to consider the question has rejected Scott's contention. See, *e.g.*, *United States v. Lee*, 374 F.3d 637, 638 (8th Cir. 2004); *United States v. Montgomery*, 2007 WL 1031282 (Order) (W.D. Mo. 2007); *United States v. Diaz*, 2007 WL 656831 (Order) (N.D. Cal. 2007); *United States v. Gooch*, 2006 WL 3780781 (Order) (D. D.C. December 20, 2006); *United States v. Cheever*, 423 F. Supp. 2d 1181, 1193-95 (D. Kan. 2006); *United States v. Rodriguez*, 380 F. Supp. 2d 1041, 1054 (D. N.D. 2007); *United States v. Le*, 327 F. Supp. 2d 601, 606-08 (E.D. Va. 2004); *United States v. Taylor*, 302 F. Supp. 2d 901, 905-06 (N.D. Ind. 2003); *United States v. Haynes*, 269 F. Supp. 2d 970, 984-85 (W.D. Tenn. 2003); *United States v. Johnson*, 239 F. Supp. 2d 924, 945-46 (N.D. Iowa 2003); *United States v. Davis*, 2003 WL 1837701 (Order) (E.D. La. April 9, 2003); *United States v. Matthews*, 246 F. Supp. 2d 137, 142-46 (N.D. N.Y. 2002); *United States v. Lentz*, 225 F. Supp. 2d 672, 682-84 (E.D. Va. 2002); *State v. Berry*, 2003 WL 1855099 (Tenn. Crim. App. 2003).

We hold the evidentiary standard provided by K.S.A. 21-4624(c) is consistent with the United States Supreme Court's "all relevant evidence" doctrine. See *Jurek v. Texas*, 428 U.S. 262, 276, 49 L. Ed. 2d 929, 96 S. Ct. 2950 (1976) ("What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine."); *Gregg v. Georgia*, 428 U.S. 153, 204, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976); see also *Woodson v. North Carolina*, 428 U.S. 280, 304, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976) (Brennan, J., concurring) (in capital cases "the Eighth Amendment . . . requires consideration of the character and record ·of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death"). It provides

for an individualized inquiry, and does not limit the discretion of the sentencer to consider relevant circumstances offered by the defendant. K.S.A. 21-4624(c) provides that only relevant evidence is to be admitted, thus assuring the evidence actually has probative value. Moreover, evidence secured in violation of the United States Constitution or the Kansas Constitution is inadmissible. Consequently, we conclude the relaxed evidentiary standard is sufficient to protect the defendant's right to a fair trial and does not violate either the United States or Kansas Constitutions.

## CONSTITUTIONALITY OF NOTICE PROVISIONS

Scott contends the notice provisions provided for in K.S.A. 21-4624(a) are unconstitutional because they do not require the State to specify the aggravating factors in the information. K.S.A. 21-4624(a) states:

"If a defendant is charged with capital murder, the county or district attorney shall file written notice if such attorney intends, upon conviction of the defendant, to request a separate sentencing proceeding to determine whether the defendant should be sentenced to death. Such notice shall be filed with the court and served on the defendant or the defendant's attorney not later than five days after the time of arraignment. If such notice is not filed and served as required by this subsection, the county or district attorney may not request such a sentencing proceeding and the defendant, if convicted of capital murder, shall be sentenced to life without the possibility of parole, and no sentence of death shall be imposed hereunder."

Scott argues that under *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999), and *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), aggravating factors, as elements of the offense, must be set forth in the charging document.

Scott's argument is not persuasive. *Jones* and *Apprendi* both stand for the proposition that, under the grand jury provision of the Fifth Amendment and the notice and jury trial provision of the Sixth Amendment, any fact other than a prior conviction that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. However, Scott fails to recognize that the requirement that such facts be charged in an indictment only applies in federal cases,

as the Fifth Amendment's grand jury provision does not apply to the states through the Fourteenth Amendment. See *Ring v. Arizona*, 536 U.S. at 597 n.4; *Apprendi*, 530 U.S. at 477 n.3; *Hurtado v. California*, 110 U.S. 516, 538, 28 L. Ed. 232, 4 S. Ct. 111 (1884).

Second, the only notice requirement for state cases would be through the Sixth Amendment. See *State v. Hunt*, 357 N.C. 257, 274, 582 S.E.2d 593 (2003) (stating "[t]he only possible constitutional implication that *Ring* and *Apprendi* may have in relation to our capital defendants is that they must receive reasonable notice of aggravating circumstances, pursuant to the Sixth Amendment's notice requirement"). The question, therefore, is whether Kansas' notice procedures concerning aggravating circumstances comport with the Sixth Amendment.

The Sixth Amendment requires only that the defendant be given "notice and an opportunity to respond." *Fawcett v. Bablitch*, 962 F.2d 617, 618 (7th Cir. 1992). Such "[n]otice must be sufficient to make the opportunity useful." 962 F.2d at 618.

Under K.S.A. 21-4624(a) the State is required to provide the defendant with notice of the State's intent to seek the death penalty no later than 5 days following arraignment. Once done, the defendant is put on notice the State will attempt to prove at least one of the eight aggravating factors listed in K.S.A. 21-4625. Of those eight, the State must notify the defendant of the specific factors it will be attempting to prove "prior to the sentencing proceeding." K.S.A. 21-4624(c). This notice is sufficient to give the defendant a meaningful opportunity to respond to the aggravating factors against him or her. The eight aggravating factors are sufficiently distinct that, in almost all cases, it will be apparent to the defendant prior to trial which factors the State will be relying on. Even in the event there is some ambiguity as to the factors that will be relied on, the State is required to provide the exact factors prior to the penalty phase. This is sufficient to satisfy the Sixth Amendment notice provision.

## JUROR MISCONDUCT DURING FIRST PENALTY PHASE TRIAL

Scott argues juror misconduct during the first penalty phase trial

denied him a verdict of life. He contends that because of this misconduct, a sentence of death could not be constitutionally imposed.

In the first penalty phase trial, the jury deliberated for 2 days before returning a verdict of death. Following the verdict, Scott filed a motion for new trial, arguing several of the jurors had improperly read from the Bible and other religious material during deliberations. The trial court decided it was appropriate to recall the jurors and hold a hearing.

At the hearing, it was clear a Bible and some copied pages from a Roman Catholic catechism were brought in, and passages relating to mercy and punishment were consulted by some jurors. However, no juror testified the extraneous material affected his or her deliberations in any way. Nevertheless, the trial court determined it was important in a capital case that the verdict be free from outside influences, and therefore the verdict should be set aside and a new penalty phase trial conducted.

Scott argues he would have received a verdict of life had the jury not been influenced by outside sources, and Kansas law and the Fifth Amendment require that he not again be subjected to the death penalty. In support of this contention, he cites K.S.A. 21-4624(e) and this court's opinion in *State v. Stafford*, 255 Kan. 807, 878 P.2d 820 (1994), as well as *Bullington v. Missouri*, 451 U.S. 430, 68 L. Ed. 2d 270, 101 S. Ct. 1852 (1981).

K.S.A. 21-4624(e) (Furse) provided, in pertinent part: "If, after a reasonable time for deliberation, the jury is unable to reach a verdict, the judge shall dismiss the jury and impose a sentence of imprisonment as provided by law." In 2004, the legislature clarified that, under these conditions, the law provided for a sentence of life imprisonment without the possibility of parole. K.S.A. 21-4624(e) (Torrence).

In *State v. Stafford*, we held that, where the trial court discharged a juror and substituted an alternate juror in a hard 40 proceeding without reasonable cause because the original juror was not able to reach a decision, the defendant could not thereafter be sentenced to the hard 40. 255 Kan. at 823-26. We reasoned:

"In the hard 40 context, a hung jury is not an undecided jury. By statute [citation omitted], a hung jury results in a sentence of imprisonment for life with eligibility

for parole. Thus, to replace a juror who may cause a jury to be unable to reach a unanimous vote to recommend the hard 40 sentence is to deprive the defendant of a verdict." 255 Kan. at 825.

Scott's argument is flawed. There is no evidence the outside material deprived him of a verdict. While the jurors had been deliberating for 2 days, there is no evidence that, absent the outside material, they would have been unable to reach a decision. No juror testified the outside material influenced deliberations in any way. Thus, neither K.S.A. 21-4624(e) nor *Stafford* is applicable.

Further, contrary to Scott's argument, the Fifth Amendment does not mandate that he not again be subjected to the death penalty. In *Bullington*, the United States Supreme Court found the Fifth Amendment's Double Jeopardy Clause applies to the penalty phase of a bifurcated proceeding and, because the defendant had previously received a sentence of life which had later been reversed, he could not thereafter be subjected to the death penalty for the same offense. 451 U.S. at 445-47. However, in the case at hand, Scott did not receive a verdict of life, nor is there any proof he would have received one absent the improper consultation of the outside religious material. As a result, this argument fails.

## FAILING TO INSTRUCT JURORS THEY NEED NOT UNANIMOUSLY AGREE REGARDING THE EXISTENCE OF MITIGATING CIRCUMSTANCES

Scott contends the trial court erred in failing to instruct the jurors they need not unanimously agree regarding the existence of mitigating circumstances. At an instructional conference, the defendant did lodge a timely objection to Instruction No. 5 given by the court and did request supplemental language that was rejected. Scott believes the trial court's instruction without the requested supplemental language prevented the jury from considering any mitigating circumstances not unanimously found to exist.

In considering a claim that a jury instruction in the penalty phase of a capital trial prevented the jury from giving proper consideration to mitigating evidence, our standard of review is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of con-

stitutionally relevant evidence." *Boyde v. California,* 494 U.S. 370, 380, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990). However, we consider the instructions as a whole and do not isolate any one instruction. Even if erroneous in some way, instructions do not result in reversible error if they properly and fairly state the law as applied to the facts of the case and could not reasonably have misled the jury. *State v. Edgar,* 281 Kan. 47, 54, 127 P.3d 1016 (2006).

Instruction No. 5 reads:

"Mitigating evidence is not evidence offered as an excuse for the crimes of which Mr. Scott has been found guilty. Rather, it is any evidence, which in fairness and mercy, may serve as a basis for a sentence other than death.

"A mitigating circumstance is that which in fairness or mercy may be considered as extenuating or reducing the degree of moral culpability or blame or which justify a sentence of less than death, although it does not justify or excuse the offense. *The determination of what are mitigating circumstances is for you as jurors to resolve under the facts and circumstances of this case.*

"The appropriateness of the exercise of mercy can itself be a mitigating factor you may consider in determining whether the State has proved beyond a reasonable doubt that the death penalty should be imposed.

"You may consider as mitigating any circumstance which tends to justify the penalty of life in prison. You must consider all evidence of mitigation. Mitigation may be established by any evidence introduced by either party. You may not refuse to consider any evidence in mitigation. The law requires you to consider all mitigating evidence. Therefore you are not permitted to refuse to consider such evidence." (Emphasis added.)

Scott's proposed instruction to supplement the above instruction reads:

"A mitigating circumstance does not have to be proven beyond a reasonable doubt but by a mere preponderance of the evidence. You must find a mitigating circumstance exists if there is any substantial evidence to support it. Additionally, unlike aggravating circumstances, which must be proven and agreed upon unanimously, mitigating circumstances must be determined on an individual basis by each jury member."

Before proceeding with an analysis, we also note two other instructions given by the trial court pertaining to the issue presented.

Instruction No. 7, in explaining the potential verdicts, informed the jury:

"At the conclusion of your deliberations, you shall sign the verdict form upon which you agree. The verdict form provides for the following alternative verdicts:

"1.   That you are unable to reach a unanimous verdict; or

"2.   That you have a reasonable doubt that aggravating circumstances are not outweighed by any mitigating circumstances, and Mr. Scott should be sentenced by the court as proved by law; or

"3.   That you *unanimously find beyond a reasonable doubt that there are one or more aggravating circumstances and they are not outweighed by any mitigating circumstances*, and sentence Mr. Scott to death." (Emphasis added.)

Instruction No. 8 given by the trial court explains the weighing process to the jury as follows:

"In making the determination whether aggravating circumstances exist that are not outweighed by any mitigating circumstances, you should keep in mind that your decision should not be determined solely by the number of aggravating or mitigating circumstances that are shown to exist.

"*If you find beyond a reasonable doubt that there are one or more aggravating circumstances and that they are not outweighed by any mitigating circumstances, then you may impose a sentence of death. If you sentence Mr. Scott to death, you must designate upon the verdict form with particularity the aggravating circumstances which you found beyond a reasonable doubt.*

"*If you have a reasonable doubt that aggravating circumstances are not outweighed by any mitigating circumstances, then you shall so indicate on your verdict form, and Mr. Scott will not be sentenced to death but will be sentenced by the court as provided by law.*" (Emphasis added.)

The issue Scott raises was considered in *Kleypas*. There, the jury was instructed as follows:

"*It is not necessary that all jurors agree upon particular facts and circumstances in mitigation of punishment.*

"If you as a juror determine that there are facts or circumstances in mitigation of punishment sufficient to outweigh the evidence of aggravating circumstances, then you must not return a verdict of death." (Emphasis added.) *Kleypas*, 272 Kan. at 1077.

This court held the first sentence of the instruction was sufficient to address the concern the jury might believe unanimity was required as to mitigating circumstances. 272 Kan. at 1079. However, we noted:

"[A]ny instruction dealing with the consideration of mitigating circumstances should state (1) they need to be proved only to the satisfaction of the individual juror in the juror's sentencing decision and not beyond a reasonable doubt and (2) mitigating circumstances do not need to be found by all members of the jury

in order to be considered in an individual juror's sentencing decision." 272 Kan. at 1078.

*Kleypas* was decided by this court after Scott's jury trial. However, the first sentence of the above instruction in *Kleypas* is not present in Instruction No. 5 or No. 8.

In addition to the instructions we have emphasized, we have considered all of the other instructions given by the trial court in an effort to decide whether jurors could have reasonably been misled to believe unanimity was required as to mitigating circumstances. Read together, the instructions repeatedly emphasize the need for unanimity as to any aggravating circumstances found to exist. Conversely, the trial court's instructions do not inform the jury as to a contrary standard for determining mitigating circumstances. The jury is left to speculate as to the correct standard. Under these circumstances, we conclude there is a substantial probability reasonable jurors could have believed unanimity was required to find mitigating circumstances. We hold failure of the trial court to provide the jury with a proper standard for determining mitigating circumstances constitutes reversible error. See *Mills v. Maryland*, 486 U.S. 367, 100 L. Ed. 2d 384, 108 S. Ct. 1860 (1988) (holding a death sentence should be vacated where there was a substantial probability reasonable jurors may have thought they could only consider those mitigating circumstances unanimously found to exist). Accordingly, we must reverse the death sentence and remand to the district court for a new capital sentencing hearing.

Scott claims a number of additional errors in the penalty phase, which could be disregarded because of our decision reversing the death sentence and remanding for a new sentencing proceeding. We will, however, address the remaining issues to provide guidance because they could arise in the retrial of the penalty phase. See *State v. White*, 279 Kan. 326, 342, 109 P.3d 1199 (2005).

## THE AGGRAVATING CIRCUMSTANCE OF CREATING A RISK OF DEATH TO MORE THAN ONE PERSON

Scott argues this court should set aside the jury's finding he created a great risk of death to more than one person. See K.S.A.

21-4625(2) ("The defendant knowingly or purposely killed or created a great risk of death to more than one person."). Specifically, Scott makes three arguments: (1) a finding based on the death of Douglas Brittain is unconstitutional as it duplicates an element of capital murder; (2) a finding based on great risk of death to the three Brittain children is not supported by the evidence; and, (3) in any event, the trial court failed to give the jury an alternative acts instruction.

### A.    Death of Douglas Brittain

The intentional premeditated murder of Douglas Brittain is an element of the capital murder conviction. Scott argues that allowing duplication of the element as an aggravating circumstance constitutes double counting and fails to channel jury discretion in the weighing process. We do not agree with Scott's analysis.

In order for a capital sentencing scheme to pass constitutional muster, it must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983). One way in which sentencing schemes do so is in the use of aggravating circumstances. However, the use of aggravating circumstances is not an end in itself, but rather is simply a means of narrowing the class of death-eligible persons; the narrowing function can be performed by jury findings at either the sentencing phase of the trial or the guilt phase. *Lowenfield v. Phelps*, 484 U.S. 231, 244-45, 98 L. Ed. 2d 568, 108 S. Ct. 546 (1988).

In *Lowenfield,* the Supreme Court explained:

"Here, the 'narrowing function' was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that 'the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.' The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so *the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.* There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows

for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more." (Emphasis added.) 484 U.S. at 246.

*Lowenfield* seems to dictate a similar result in the instant case. Scott, however, argues *Lowenfield* is inapplicable as Louisiana's death penalty scheme does not provide for the weighing of aggravating circumstances against mitigating circumstances. Scott relies on the United States Supreme Court's opinion regarding the Mississippi death penalty scheme in *Stringer v. Black*, 503 U.S. 222, 117 L. Ed. 2d 367, 112 S. Ct. 1130 (1992).

Scott is correct in that *Stringer* does distinguish *Lowenfield* in some respects with regard to weighing states. However, it does not address the issue before us. Rather, *Stringer* stands for the following proposition: Where a scheme uses an aggravating factor in deciding who shall be eligible for the death penalty, that aggravating factor cannot be one which, as a practical matter, fails to guide the sentencer's discretion or is vague or imprecise. See 503 U.S. at 235-36. *Stringer* does not indicate that, in a weighing state, it is impermissible to use the same factor in both the guilt and penalty phase. Rather, *Stringer* reasons that in weighing states, it is not correct to say that because there is narrowing at the guilt phase, the use of aggravating factors at the penalty phase is of no constitutional moment. See 503 U.S. at 234-36.

We believe the issue decided in *Lowenfield* is the same as now before us: whether the use of the same factor as both a narrowing qualification for the death penalty at the guilt phase and an aggravating factor at the penalty phase fails to narrow the class of persons convicted of murder who are eligible for the death penalty. The vast majority of weighing jurisdictions that have considered this question have also held such a use is constitutionally permissible. See *Kuenzel v. State*, 577 So. 2d 474, 487-88 (Ala. Crim. App. 1990); *Johnson v. State*, 308 Ark. 7, 17, 823 S.W.2d 800 (1992); *People v. Marshall*, 50 Cal. 3d 907, 945-46, 269 Cal. Rptr. 269, 790 P.2d 676 (1990); *Oken v. State*, 343 Md. 256, 301-02, 681 A.2d 30 (1996); *State v. Lafferty*, 20 P.3d 342, 376-77 (Utah 2001); see also *Deputy v. Taylor*, 19 F.3d 1485, 1501-02 (3d Cir. 1994) (interpreting Delaware law); *Revilla v. Gibson*, 283 F.3d 1203, 1215

(10th Cir. 2002) (arising out of Oklahoma law); *United States v. Chanthadara*, 230 F.3d 1237, 1261 (10th Cir. 2000) (interpreting federal Death Penalty Act and stating: "[T]he duplication of a factor between the gateway factors and aggravating factors does not undermine the constitutional validity of the sentence); *Johnson v. Singletary*, 991 F.2d 663, 668-69 (11th Cir. 1993) (interpreting Florida law).

Scott also argues that using the same conduct to make a crime capital murder and also using it as an aggravating factor is contrary to Kansas law. In support of this contention, he cites PIK Crim. 3d 56.00-C, which provides that "[a]ggravating circumstances are those which increase the guilt or enormity of the crime or add to its injurious consequences, but which are above or beyond the elements of the crime itself." Scott points out that because the intentional killing of more than one person is an element of capital murder, using it as an aggravating factor would mean it was not a circumstance above or beyond the element of the crime itself. However, although PIK instructions are generally well thought out, they do not trump the obvious intent of the legislature. See *State v. Kleypas*, 272 Kan. at 1063-64 (holding a PIK instruction was contrary to Kansas law). The legislature clearly intended for the conduct to be used both as a qualifier and an aggravator. PIK Crim. 3d 56.00-C should be modified to conform to Kansas law.

We join the majority of jurisdictions that have concluded duplicating an element of the crime as an aggravating circumstance in the penalty phase of the trial is constitutional and conforms to legislative intent.

B.   Sufficiency of the Evidence

Scott next argues the evidence is insufficient to establish the killings created a great risk of death to the Brittain children. He contends any danger to the Brittain children was too remote in time to the murders to satisfy the aggravating factor under K.S.A. 21-4625(2).

This court has previously analyzed this same aggravating factor in the context of hard 40 sentences and has held that for the factor to apply, there must be

"a direct relationship between creating the great risk of death to another and the homicide. The risk need not be contemporaneous with the homicide, but it must occur in the course of committing the charged murder." *State v. Spain*, 263 Kan. 708, 718, 953 P.2d 1004 (1998).

A survey of Kansas cases demonstrates the issue presented is fact intensive and not easily resolved. See, *e.g.*, *State v. Brown*, 272 Kan. 809, 818-22, 37 P.3d 31 (2001) (occupant of house where victim bludgeoned to death); *State v. Lopez*, 271 Kan. 119, 139-40, 22 P.3d 1040 (2001) (defendant shot at the driver of a moving vehicle in which another passenger was present); *State v. Saiz*, 269 Kan. 657, 667, 7 P.3d 1214 (2000) (mother and brother of the victim were also shot at during a drive-by shooting which resulted in victim's death); *State v. Spain*, 263 Kan. at 714-18 (after jail escape, defendant took hostage); *State v. Follin*, 263 Kan. 28, 47, 947 P.2d 8 (1997) (defendant stabbed his two young daughters at relatively the same time); *State v. Stafford*, 255 Kan. 807, 818-19, 878 P.2d 820 (1994) (victims both shot as they entered the house together).

We can only speculate as to why the State decided to argue great risk of death to the three Brittain children should be considered by the jury. Very likely the State was concerned because of Scott's argument of double counting the murder of Douglas Brittain. In any event, because we have decided the killing of Douglas Brittain supports this aggravating circumstance and ordered a new penalty phase trial, it is uncertain whether the issue would arise again on remand. Consequently, there is no reason for us to now decide this issue.

C. Failure to Instruct on Unanimity

Scott's final argument with regard to the "great risk of death to more than one person" aggravating factor is that the district court erred in failing to instruct the jurors they had to unanimously agree on a specific act to prove the aggravating circumstance. Scott contends that where, as here, the State relied on two alternate bases for the aggravating factor, the jury must be instructed it must unanimously agree on which act was the basis for the finding of the aggravating factor. For the same reason as above, there is no reason

for us to address this issue because it is not certain whether it would arise again on remand.

## THE AGGRAVATING FACTOR SCOTT COMMITTED THE CRIME FOR PURPOSE OF RECEIVING MONEY

Scott contends the jury should not have been allowed to consider the aggravating factor that "[t]he defendant committed the crime for the defendant's self or another for the purpose of receiving money or any other thing of monetary value." See K.S.A. 21-4625(3). He first argues 21-4625(3) only applies to murder-for-hire situations or where the defendant kills the victim to obtain an inheritance. He also argues a broader reading of the statute is unconstitutional under the Eighth Amendment. We have addressed this question in a manner adverse to Scott's argument in the context of the hard 40 aggravating factors. See *State v. Cromwell*, 253 Kan. 495, 513, 856 P.2d 1299 (1993). In *Cromwell*, we stated: "The legislature has said that it is particularly egregious to take the life of another to obtain property" and "[t]he language of the statute is not expressly limited to cases involving murder for hire." 253 Kan. at 513; see also *State v. Deiterman*, 271 Kan. 975, 993, 29 P.3d 411 (2001) (finding aggravating circumstance satisfied where defendant shot victim in order to obtain victim's wallet); *State v. Murillo*, 269 Kan. 281, 288-89, 7 P.3d 264 (2000) (finding aggravating circumstance satisfied where defendant committed the crime while trying to obtain cocaine); *State v. Vontress*, 266 Kan. 248, 259, 970 P.2d 42 (1998) (finding aggravating circumstance satisfied where defendant committed the crime for the purpose of obtaining money and drugs) *disapproved in part on other grounds State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006); *State v. Richardson*, 256 Kan. 69, 83, 883 P.2d 1107 (1994) (finding aggravating circumstance satisfied where defendant shot victim in order to take her purse).

Scott recognizes our prior precedent, but argues the outcome should be different in a death penalty case. He contends: (1) our hard 40 jurisprudence is not applicable in the context of a death penalty case because aggravating factors in death cases must "gen-

uinely narrow" the class of persons subject to the death penalty and be defined by some specificity; and (2) the plain language of the statute indicates it should be limited to murder-for-hire and other schemes rather than a murder/burglary or murder/robbery.

Scott is correct in arguing our hard 40 jurisprudence does not translate directly to our interpretation of the death penalty. We have stated our jurisprudence in hard 40 cases is not controlling in death penalty cases, and vice versa. *State v. Kleypas*, 272 Kan. at 1009; *State v. Spain*, 269 Kan. 54, 60, 4 P.3d 621 (2000). Nevertheless, the aggravating factor at issue for the death penalty, found in K.S.A. 21-4625(3), is exactly the aggravating factor previously in the statute when it described the aggravating factors for the hard 40. When the Kansas Death Penalty Act was passed in 1994, and the statutes relating to the hard 40 were deleted and replaced with those applicable to the death penalty, 21-4625 was not changed; rather, the aggravating factors in it were simply made applicable to the death penalty rather than the hard 40. See L. 1990, ch. 99, sec. 5; L. 1994, ch. 252. Thus, we conclude legislative intent was not to modify its meaning or the circumstances under which it would apply in capital cases.

The remaining question is whether this construction would comport with the Eighth Amendment. Scott argues the Eighth Amendment requires aggravating factors to channel the sentencer's discretion by clear and objective standards providing specific and detailed guidance.

In *Godfrey v. Georgia*, 446 U.S. 420, 427-28, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980), the Court held that a death penalty scheme must provide a " 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not' " and the scheme must "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.' "

Scott fails to provide any reasons why application of the aggravating factor at issue to murder/robbery or murder/burglary would violate these requirements. The point of the channeling is to distinguish murders which are eligible for the death penalty from

murders which are not. See *Zant v. Stephens*, 462 U.S. at 877. Because the legislature can rationally determine that murder committed in order to facilitate a robbery or burglary is worthy of greater punishment than a murder not for that purpose, the aggravating factor at issue is a valid one.

## FAILURE TO DEFINE "THE CRIME"

Scott contends the trial court erred in failing to explicitly instruct the jury that "the crime," for the purpose of the aggravating factor that "[t]he defendant committed the crime for the defendant's self or another for the purpose of receiving money or any other thing of monetary value," meant the capital murder of Elizabeth Brittain. He argues without such an explicit instruction, there may have been jury confusion as to "the crime" necessary to support the aggravating factor.

Jury Instruction No. 4 states Scott "committed the crime for the purpose of receiving money or any other thing of monetary value." The language of the instruction is taken from PIK Crim. 3d 56.00-C(3), which is entitled "Capital Murder-Death Sentence-Aggravating Circumstances."

Because we have already concluded Scott is entitled to a new sentencing trial, we choose to dispose of this issue in summary fashion. The phrase "the crime" is inadvisable under the circumstances of this case and, under other circumstances, might very well be prejudicial. PIK Crim. 3d 56.00-C(3) should be revised to specifically designate the crime of capital murder. On remand, the trial court should conform its instruction to specify the charge of capital murder.

## PROSECUTORIAL MISCONDUCT

Scott contends the State committed prosecutorial misconduct in several instances during closing argument. He argues the prosecutor asserted he had "no earthly right to ask for [mercy]"; asserted he showed "phantom remorse"; asserted his mental illness did not prevent him from committing the crimes; referred to the impact of the crimes on the Brittain family; misstated the law regarding

the meaning of the aggravating factor "great risk of death to more than one person"; and referred to a fact not in evidence.

As we previously stated in analyzing the prosecutorial misconduct issue from the guilt phase, appellate review requires a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude the prosecutor is allowed in discussing the evidence. Second, the appellate court decides whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Swinney*, 280 Kan. 768, 779, 127 P.3d 261 (2006) (citing *State v. Tosh*, 278 Kan. 83, Syl. ¶¶ 1, 2, 91 P.3d 1204 [2004]).

In the second step of the two-step analysis, the appellate court considers the following three factors: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of the jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors unless the harmless error tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), have been met. *Swinney*, 280 Kan. at 780. Under K.S.A. 60-261, if substantial rights of the defendant have been prejudiced, the error is not harmless. Under *Chapman*, an error is not harmless beyond a reasonable doubt unless the error had little, if any, likelihood of having changed the result of the trial.

A. Argument of "No Earthly Right to Ask for Mercy"

During closing, the prosecutor made the following statements in response to Scott's arguing for mercy:

"Mercy. They're asking that you have mercy on this killer. They're asking you to exercise that act of grace which never entered the killer's mind on September 13th, 1996. They're asking you to spare him for no reason other than that.

"Let's talk about another term that we've heard, though. Moral culpability. This is a term that's in your instructions as well. And, when you are considering this plea for mercy, this plea that the State suggests he has no earthly right to ask for after his offense, consider moral culpability also."

Scott argues these statements by the prosecutor demeaned the mitigating concept of mercy, in violation of the Eighth Amendment.

This court discussed prosecutorial misconduct in commenting on the concept of mercy in *State v. Kleypas*, where we stated:

"In a capital case, it is important for the jury to be able to evaluate whether a defendant is deserving of mercy. As part of the same concept, however, it is clearly proper for a prosecutor to argue against the granting of mercy. We hold that it is proper for the prosecutor to argue that the defendant is not deserving of the jury's mercy because of the defendant's actions, as long as the prosecutor does not improperly state the law by arguing to the jury that it is prohibited from granting mercy to the defendant because the defendant showed none to the victim." 272 Kan. at 1110-11.

Despite Scott's contention, the prosecutor's comments in this case were clearly aimed at arguing Scott did not deserve mercy. At no time did the prosecutor argue the jury was prohibited from showing Scott mercy. Rather, the prosecutor explicitly told the jury that granting mercy would be an "act of grace." Further, the prosecutor requested that when the jurors were considering Scott's plea for mercy, they also consider moral culpability. As a result, these comments were not improper.

B.   Argument of "Phantom Remorse"

During the penalty phase, Scott addressed the jury and made the following statements:

"I wanted to just, you know, tell everybody I was sorry for the stuff that happened, you know. I grew up mostly away from my family. I was in and out of boys' homes. I know what it's like. And now I had two sisters just like the young boy, and I know they're all gonna grow up without their parents around, you know, they ain't got the chance that I got to, you know, make amends with my family for the things that happened in my life. And, you know, I can't—I can't apologize enough to show how sorry I am for the things that happened. And I wish I could take it back. I can't. All's I can do is ask that you guys, you know, see how true I am about my apology, you know. Don't sentence me to life—I mean, sentence me to life and not death. That's all I have to say."

In closing, the prosecutor argued:

"These two aggravating factors, the destroyed family and the destruction of that family for things increase the enormity of this man's crime to a level where nothing

outweighs it. Not age. Not pitiful background. *Certainly not phantom remorse.* Not even mercy." (Emphasis added.)

Scott contends the use of the term "phantom remorse" was a comment on the prosecutor's opinion of Scott's credibility, and was improper.

In *State v. Pabst,* 268 Kan. 501, 506-07, 996 P.2d 321 (2000), we cited the ABA Standards of Criminal Justice and held that, in closing argument, prosecutors should not state their personal opinion as to the credibility of the defendant. In labeling Scott's remorse as "phantom," the prosecutor in this case did in fact state his personal opinion as to Scott's credibility. Thus, this statement did constitute prosecutorial misconduct. On remand, this argument should not be permitted.

## C. Argument Regarding Scott's Mental Illness

The prosecutor argued:

"Several of the mitigators cite his mental illness and brain damage. Interestingly enough, remember something that Dr. Cunningham said. His congenital brain damage is consistent with other murderers. He tested like a murderer. Is it surprising then that he has these problems? Could anyone who commits two premeditated murders for the purpose of obtaining things be mentally normal? Does depression or reactive attachment disorder, any of those things or their treatability reduce Scott's moral culpability for this crime?

*"His blame, his mental state did not prevent him from committing these two premeditated murders, did not keep him from placing those kids in danger, did not keep him from lying to the Sheriff about it.*

"Besides, remember Dr. Cunningham. He described Gavin as a poor historian. Remember how well this poor historian described the layout of the Brittain residence for Holtz and Oliver, how he drew it out in excruciating detail. This is a man who is in command of all of his senses on September 13, 1996. He was in the Brittain home long enough to commit the layout to memory. He may have mental problems, but they weigh little compared to the weight of the aggravating circumstances." (Emphasis added.)

Scott argues these statements were improper because they sought to convince the jury not to give weight to mitigating evidence because it did not excuse the crimes.

In *State v. Kleypas,* we held:

"[I]t is improper for a prosecutor to argue that certain circumstances should not be considered as mitigating circumstances because they do not excuse or justify

the crime. 'Mitigating circumstances are those which in fairness may be considered as extenuating or reducing the degree of moral culpability or blame or which justify a sentence of less than death, even though they do not justify or excuse the offense.' [Citations omitted.] A prosecutor who argues that mitigating circumstances must excuse or justify the crime improperly states the law." 272 Kan. at 1103.

In the case at hand, however, the prosecutor did not argue Scott's mental illness should not be considered because it did not excuse or justify the crime. Read in context, the argument was that Scott's mental illness was not as severe as he made it out to be, because it did not "prevent" him from committing the crimes. Granted, there is some suggestion in the statement that Scott's mental illness did not excuse his culpability. However, taken in context, these statements did not contravene the "considerable latitude" prosecutors are allowed in commenting on the evidence. See *Kleypas*, 272 Kan. at 1084.

D.    Argument Regarding Impact of the Crimes on the Brittain Family

Scott next argues the prosecutor improperly commented at several junctures on the impact of the crime on the Brittain family. He contends these comments were improper because victim impact evidence is not relevant to any aggravating factor in Kansas.

An examination of the record reveals several times during the prosecutor's closing argument when the prosecutor mentioned the effect of the murders on the Brittain family. On several occasions, the prosecutor argued Scott "destroyed the Brittain family." The prosecutor also argued Scott's relationships with his family did not bear much weight compared to "the relationships that can never be ever again thanks to his deliberate actions." In commenting on Scott's culpability, the prosecutor stated:

"[Scott] is not only responsible for his physical acts, breaking in through the girls' bedroom, confronting them, threatening them, murdering the Brittains in their sleep, he is morally culpable for those acts and their results. The shattered lives he left behind."

Under the United States Constitution, victim impact evidence is admissible in a capital case. *Payne v. Tennessee*, 501 U.S. 808,

115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991). In *Payne*, the United States Supreme Court stated: "[A] State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." 501 U.S. at 825. The Court also stated: "[A] State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." 501 U.S. at 827.

The issue is whether such evidence is admissible under Kansas law. K.S.A. 21-4624(c) provides: "[E]vidence may be presented concerning any matter that the court deems relevant to the question of sentence and shall include matters relating to any of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto and any mitigating circumstances." We conclude the plain language of 21-4625 permits consideration of victim impact evidence if such evidence is relevant to the question of sentence, *i.e.*, an aggravating or mitigating factor.

In this case, most of the prosecutor's remarks were not based on traditional victim impact evidence. Instead, his remarks were aimed at describing the act involved more than on the actual impact of the crime on the survivors. The only statement perhaps related to the impact of the crime on the victims is the statement that evidence of Scott's relationship to the family should be given little weight compared to the relationships his crime severed. We hold the prosecutor's statements were relevant to the question of sentence and therefore not improper.

E. Misstating the Meaning of an Aggravating Factor

Scott next contends the prosecutor committed misconduct by misstating the meaning of an aggravating factor. In discussing the aggravating factors alleged by the State and, more specifically, the defendant's creating a great risk of death to more than one person, the prosecutor made the following statement:

"The first is: That the defendant knowingly or purposely killed or created a great risk of death to more than one person.

"That is sterile legal terminology which says that that man destroyed the Brittain family. There is no doubt that this aggravating circumstance exists. He shot Doug and Beth to death in their sleep. Killed more than one person. That is enough."

A prosecutor is charged with the duty not to misstate the law. With the above statements, however, the prosecutor in this case was arguing the great risk of death came about when Scott "destroyed the Brittain family" by shooting both Douglas and Elizabeth Brittain. Within the context of the evidence presented at trial, the instructions given by the trial court, and the complete closing arguments of the parties, we do not conclude the prosecutor's statements fell outside the considerable latitude allowed in arguing the evidence.

## F.  Referring to Facts Not in Evidence

Scott's final contention with regard to prosecutorial misconduct is that the prosecutor referred to a fact not in evidence; specifically, the statement of the prosecutor that Scott and Wakefield "took a .22 caliber pump rifle with them" to the Brittain house. Scott contends there was no evidence they took the rifle to the house as opposed to finding it in the house. However, while it was unclear from the evidence where the pump rifle came from, the rifle did have Wakefield's fingerprint on it. Further, Scott, in his confession, stated his accomplice was armed with a "cut-down gun." We believe it was a fair inference from the evidence that Wakefield brought the .22 rifle at issue with him. As a result, this statement did not constitute misconduct.

## USE OF SPECIAL VERDICT FORM

Scott contends the trial court erred in admitting into evidence in the penalty phase the special verdict form from the guilt phase stating Scott individually and personally killed or intended to kill Douglas and Elizabeth Brittain. According to Scott, this finding should have been a part of the penalty phase, and by taking it away from the jury, the district court denied him the right to have the jury make the finding.

Use of the special verdict form arose because there was some question as to whether it was Scott or Wakefield who actually fired

the fatal shots. The trial court, after conferring with counsel, gave a special verdict form to the jury asking it to make a determination as to whether Scott "individually and personally killed or intended to kill" each of the victims. The jury made the finding Scott killed or intended to kill both Douglas and Elizabeth Brittain.

In *Enmund v. Florida*, 458 U.S. 782, 797, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982), the United States Supreme Court held the Eighth Amendment forbade the imposition of the death penalty on "one . . . who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." Subsequently, in *Tison v. Arizona*, 481 U.S. 137, 158, 95 L. Ed. 2d 127, 107 S. Ct. 1676 (1987), the Supreme Court clarified its holding in *Enmund*, stating that "major partici-pation in the felony committed, combined with reckless indiffer-ence to human life, is sufficient to satisfy the *Enmund* culpability requirement" and impose the death penalty. In short, these cases prohibit imposition of the death penalty unless the defendant is a major participant in the crime of felony murder.

The Kansas Death Penalty Act does not permit the imposition of the death penalty for the crime of felony murder. The crime of capital murder always requires an intentional and premeditated killing. See K.S.A. 21-3439. Even if a capital murder is predicated on a theory of aiding and abetting, we require that the defendant must intentionally aid or abet with the intent to promote or assist in the commission of the crime. *State v. Hunter*, 241 Kan. 629, 639, 740 P.2d 559 (1987). Consequently, even if Scott's conviction of capital murder was based on a theory of aiding and abetting, the trial court's instructions of law in the guilty phase were sufficient and the special verdict was not necessary.

There does remain the issue as to whether introduction of the special verdict form at the penalty phase was error. The issue is unusual, as ordinarily there would be the same jurors for both phases of the trial. Here, there was the unusual circumstance of a completely different jury in the sentencing trial.

Even if we assume error, it is difficult to see under the circum-stances of this case how there was any prejudice to Scott. A sen-

tencing jury is necessarily going to be informed the defendant has been convicted of capital murder for the intentional and premeditated killing of more than one person as part of the same act or transaction. Here, the evidence was overwhelming that Scott was the actual shooter. Introducing the special verdict form at most emphasized the obvious at the conclusion of the guilt phase of the trial—Scott "individually and personally killed" Douglas Brittain and Elizabeth Brittain.

We conclude the special verdict form was not necessary, and it is disapproved for use in future capital proceedings. On remand, however, the sentencing jury will be informed Scott has been found guilty of capital murder for the intentional and premeditated killing of the Brittains.

## PENALTY PHASE CONCLUSION

Scott's sentence for the premeditated first-degree murder of Douglas Brittain is vacated. His sentence of death for the capital murder of Elizabeth Brittain is also vacated, and the matter is remanded with instructions to hold a new capital sentencing hearing consistent with our other holdings.

Affirmed in part and reversed in part, with the sentence of death vacated and the case remanded to the district court for a new capital sentencing proceeding.

NUSS, J., not participating.

KNUDSON, S.J., assigned.

JOHNSON, J., concurring: I concur in the result reached by the majority but write separately to take issue with the applicability of the aggravating factor in K.S.A. 21-4625(3).

I agree with Scott's argument that K.S.A. 21-4625(3) should apply to such scenarios as a murder-for-hire or a killing to obtain an inheritance from the victim. The provision speaks to a defendant

murdering someone "for the purpose of receiving" money or property, suggesting a direct connection between the murder of a specific person and the acquisition of money or property because of the death of that person.

I acknowledge that our prior cases in the hard 40 context have construed the same language to encompass a murder which occurs collaterally to a robbery or burglary. In my view, in those cases, the defendant murders for the purpose of facilitating the *taking* of money or property or for the purpose of avoiding being caught for the property crime without any particular regard to the identity of the victim.

While I feel constrained by the principle of stare decisis to follow our precedent in the hard 40 cases, I do not feel bound to extend those holdings to a death penalty case. As the majority notes, our jurisprudence in hard 40 cases is not controlling in death penalty cases. 286 Kan. at 113. Therefore, I would restrict the application of K.S.A. 21-4625(3) to those instances where the defendant's purpose in killing the specific victim was to receive money or property as a direct consequence of the murder. Here, the murders were committed in the course of a burglary, and Scott did not *receive* money or property solely because the particular victims were murdered. He obtained property because he broke into the house and took it. I would find that the facts of this case would not support a finding that Scott committed the murder for the purpose of receiving money or property.

LUCKERT, J., joins in the foregoing concurrence.